RAYMOND DeSIMONE, DAVID McERLANE AND ELLIOT STAGNERI, PLAINTIFFS-APPELLANTS, v. GREATER ENGLEWOOD HOUSING CORPORATION NO. 1, A NEW JERSEY CORPORATION; BOARD OF ADJUSTMENT OF THE CITY OF ENGLEWOOD: MAYOR AND COUNCIL OF THE CITY OF ENGLEWOOD; AND MAX PRIEGEL, BUILDING INSPECTOR OF THE CITY OF ENGLEWOOD, DEFENDANTS-RESPONDENTS.

RAYMOND DeSIMONE, DAVID McERLANE AND ELLIOT STAGNERI, PLAINTIFFS-APPELLANTS, v. GREATER ENGLEWOOD HOUSING CORPORATION NO. 1, A NEW JERSEY CORPORATION; MAYOR AND COUNCIL OF THE CITY OF ENGLEWOOD; MAX PRIEGEL, BUILDING INSPECTOR OF THE CITY OF ENGLEWOOD; AND PLANNING BOARD OF THE CITY OF ENGLEWOOD, DEFENDANTS-RESPONDENTS.

JERRY J. HERSCH, DAVID McERLANE AND ELLIOT STAGNERI, PLAINTIFFS-APPELLANTS, v. THE CITY OF ENGLEWOOD, DEFENDANT-RESPONDENT, AND GREATER ENGLEWOOD HOUSING CORPORATION NO. 1, INTERVENOR-RESPONDENT.

Argued June 16, 1970—Decided July 6, 1970.

*Mr. Richard Jon Contant* argued the causes for appellants (*Messrs. Contant and Contant,* attorneys; *Mr. Richard Jon Contant,* on the briefs).

*Mrs. Sylvia B. Pressler* argued the causes for respondents Mayor and Council of the City of Englewood and The City of Englewood.

*Mr. Arthur J. Lesemann* argued the causes for respondent Greater Englewood Housing Corporation No. 1 (*Messrs. Mazer and Lesemann,* attorneys; *Mr. Lesemann,* on the briefs).

*Mr. Marvin H. Gladstone* argued the cause for respondent Board of Adjustment of the City of Englewood.

*Mr. Frederick L. Bernstein* argued the cause for respondent Planning Board of the City of Englewood (*Messrs. Wittman, Angelone and Bernstein,* attorneys; *Mr. Bernstein,* on the brief).

The opinion of the court was delivered by

HALL, J. These consolidated appeals stem from Law Division judgments in five actions in lieu of prerogative writ sustaining the actions of administrative and legislative bodies of the city of Englewood in connection with a low and moderate income housing project being undertaken by defendant Greater Englewood Housing Corporation No. 1 (GEHC).

The project comprises 146 units of cluster-type, two-story apartments to be constructed on a 10 acre tract of city-owned land, leased to GEHC, in the Second Ward of the city (the Trumbull Park site), a district zoned for one-family dwellings and primarily white in population. GEHC is an approved non-profit housing sponsor, organized by the city's Galilee United Methodist Church and incorporated under the Limited-Dividend Nonprofit Housing Corporations or Associations Law, *N. J. S. A.* 55:16–1 *et seq.,* as amended *L. 1967, c.* 112. The purpose of the project, which is to receive state and federal financial assistance, is to aid in the clearance and reconstruction of blighted areas in the predominantly black Fourth Ward of the city, necessitating relocation of many slum residents, and to provide low and moderate income families with safe, sanitary and decent living accommodations outside of that area. GEHC is also the sponsor of a companion project within the Fourth Ward (the Lafayette site), likewise in a one-family residential zone, as to which the municipal authorities acted similarly and contemporaneously and which has not been the subject of any litigation. Plaintiffs are taxpayer-residents of the

Second Ward and representatives of a local organization known as FACT (First Association of Citizens and Taxpayers).

Procedurally, the first captioned cause consists of three suits instituted in July and August 1969 and consolidated at the trial level — one challenged the validity of the ground lease from the city to GEHC; another, a use variance under *N. J. S. A.* 40:55–39(d) for multi-family structures in a one-family zone recommended by the Board of Adjustment and granted by the city governing body; and the third, a bulk variance under *N. J. S. A.* 40:55–39(c) from certain height, sideyard and similar restrictions granted by the Board of Adjustment. Judgment in favor of the defendants was entered by Judge Trautwein on November 10, 1969. Plaintiffs thereafter appealed to the Appellate Division.

The second and third captioned causes were concerned with collateral matters and were commenced in November and December 1969. One attacked the favorable referral of tentative subdivision approval of the tract, subject to enumerated conditions, by the Planning Board under the city's subdivision ordinance and the approval thereof by the governing body. (Englewood has a "weak" Planning Board with power only of referral to the governing body as to subdivision approval. *N. J. S. A.* 40:55–1.14). The other involved a claim of illegality of an ordinance (No. 1819) adopted by the governing body, which was one of the conditions of tentative subdivision approval, vacating and relocating a paper street, running through a small public park west of the project, to give access to it from a main thoroughfare. GEHC was not originally a party to this last suit, but was permitted to intervene and, in order to avoid anticipated additional litigation by plaintiffs, to file a counterclaim for a declaratory judgment with respect to the validity of (1) final subdivision approval by the Planning Board and the governing body; (2) site plan approval by the Planning Board required by the city zoning ordinance

for all new buildings other than one-family dwellings; (3) another ordinance (No. 1820) adopted by the governing body amending the subdivision ordinance to authorize the Planning Board to waive the requirement of a performance guarantee in lieu of completion of mandated subdivision improvements if the applicant is a public or non-profit housing sponsor; and (4) the action of the Planning Board in waiving the same in the case of GEHC. (A third ordinance, No. 1818, vacating paper streets running through the project area, was apparently not the subject of any litigation.) The actions were consolidated for trial and judgment for the defendants was entered by Judge Trautwein on May 20, 1970.

On that date the appeal from the judgment in the first captioned cause was ready for argument in the Appellate Division. A few days later, plaintiffs not yet having filed the expected notice of appeal from the second judgment, GEHC filed a motion with us, on notice as prescribed by the Chief Justice. In effect, it sought certification of the pending appeal from the first judgment (R. 2:12–2), acceleration of any appeal from the second judgment with an abbreviated time schedule for the filing of briefs, and consolidated early argument before us of both matters. The motion was granted on May 26 for the reasons urged, viz., the litigation is of great public importance and urgently requires prompt final adjudication, both matters involve the same subject matter and common questions, and consolidation will avoid fragmentary and onerous appeals. We directed plaintiffs, if they intended to appeal from the May 20 judgment, to do so within five days, ordered the parties to exchange briefs by June 10, and set the matter down for oral argument with the first appeal on June 16. Plaintiffs did appeal and argument was heard along with that on the first appeal on the date last mentioned. We took such action pursuant to the general power in R. 1:1–2, inter alia, to construe all rules to secure the elimination of unjustifiable delay and to relax or dispense with any rule if adherence

to it would result in an injustice and to the express power provided in *R.* 2:9–2 to accelerate the time fixed by the rules for the taking of any proceeding on appeal or certification on the court's own motion or the motion of a party, which will be freely exercised where the public interest is involved and prompt final disposition is important. For the same reason we have expedited decision and the filing of this opinion.

The basic case in this panoply of litigation is that involving the use variance. The background and setting of GEHC's Trumbull Park project is thoroughly elucidated in the voluminous testimony and extensive exhibits presented to the Board of Adjustment. From that mass of evidence the following picture emerges.

Englewood, like many others, is a city of striking contrasts. It is five square miles in area and lies on the western slope of the Palisades in eastern Bergen County. The population of about 28,000 is 20% to 25% black. It is one of the older suburban residential communities adjacent to New York City, its white population is generally affluent, and its Master Plan described it in 1959 as almost wholly built up, with an exceedingly low housing vacancy rate.

By far the greater part of the black population lives in the Fourth Ward (the southwestern quadrant of the city), literally and figuratively "on the other side of the tracks," and a very high percentage of the housing there is substandard, much of it not capable of rehabilitation. The trial judge found:

> * * * [F]or a considerable period the need for low and moderate income housing in the City of Englewood has not only been set forth and stated by government agencies and private citizens, but has been readily apparent to anyone viewing the Englewood scene. Down through the years an inevitable racial polarization of the inhabitants of Englewood has come into being. Of the City's four wards the First [northeast quadrant] and Second [southeast quadrant] are generally developed with expensive homes inhabited by Caucasians ranging from the more modest at the southern end of the Second Ward to impressive estates as one goes northward into the First Ward.

\* \* \* \* \* \* \* \*

\* \* \* [T]he Third Ward [northwest quadrant] can be generally characterized as one made up of modest one family structures on smaller lots predominately white with some degree of integration effected in recent years. The Fourth Ward, generally down hill from the First and Second Wards, is practically all black and can truly and accurately be characterized as a ghetto, a blighted and racially impacted area of the City. For some time the City of Englewood has passed resolutions and ordinances, it has conducted surveys and has issued reports in great number demonstrating the need for razing the ghetto area and building new housing.

(Plaintiffs expressly concede the need for low and moderate income housing in the Fourth Ward.)

Numerous prior efforts to provide some decent housing for the city's blacks have all failed. Not a single governmentally sponsored or assisted housing accommodation has been constructed. By reason of a racial disturbance in the city in July 1967, it became one of the communities scrutinized by the Governor's Select Commission on Civil Disorder. The Commission's "Report for Action" (February 1968) commented cogently on the housing situation, pointing out that prior efforts had foundered, in a sharply divided community, on the issue "whether to build within the Fourth Ward only, or whether to spread renewal beyond the ghetto." See discussion, *op. cit. supra.* at pp. 63–64. It recommended:

Englewood, which has the human and physical resources not only to solve its own problems but also to show the way to other communities, should consider reversing past decisions on its critical housing issue.

Political and community leaders, regardless of party, should work to unite all communities in support of solutions in accordance with public policy and the trend of the times toward residential integration. (*op. cit. supra*, at p. 169).

Obviously, the critical Englewood housing situation cries out for the active and continuous exercise of the highest responsible citizenship by all segments of the population and all governmental bodies. The governmental actions here under attack do represent the first indication of the reversal of

past decisions. Sadly to relate, however, the objectors, despite all the legalisms in which this intense and pervading litigation is couched, in truth are not trying to vindicate the policy of the many statutes they invoke, but rather only in any way at all to oppose this project.

As has been indicated, the Trumbull Park site project in question is being undertaken by GEHC simultaneously with the Lafayette site project in the Fourth Ward. They will make possible redevelopment and renewal plans in the Fourth Ward by providing relocation homes for families to be displaced thereby. Construction of both is to be financed by an already committed $5.4 million, 100% mortgage granted by the State Housing Financing Agency. Mortgage interest subsidy, as well as rent supplements to qualifying occupants, are to be provided by appropriate federal agencies. Federal regulations require, in such a situation, that new housing be built outside a ghetto area on at least a one for one basis with respect to that constructed within it. As the Board of Adjustment put it in its resolution recommending the use variance:

> It is said, in short, that slum clearance cannot proceed without relocation housing; that low and/or moderate-income housing cannot be constructed without federal subsidies; that federal subsidies will not be forthcoming in the absence of provisions for balancing new units within the area of racial concentration with new units outside the area; * * *

The Board went on to remark that the Trumbull Park site is "the only available tract of suitable size in the City outside the racially-impacted area."

The site is, as the Board of Adjustment found, isolated from existing residential uses. Located in the extreme southeasterly end of the city, it is part of a slightly larger area, laid out in lots and paper streets on a filed map in the 30's and acquired by the city for non-payment of taxes some years later. The area is hilly, wooded and unimproved except for Trumbull Park, a neighborhood recreation facility created

by the city in the 50's, fronting on the easterly sideline of Broad Avenue, a main thoroughfare, approximately 450 feet and about 330 feet deep. The easterly boundary of the park forms the westerly line of the project site. The site is further bounded on the north by city-owned parkland in a natural state and beyond that by State Highway Route 4; on the east by a steep buffer area and beyond by Jones Road; and on the south by the golf course of the Englewood Country Club which is bisected by the Englewood-Leonia Line and Interstate Highway Route 95. The closest houses are at a considerable distance — on the east side of Broad Avenue, beyond Route 4 and on the east side of Jones Road — only one or two of which will even be able to see the project buildings. The cluster-type development is designed to take advantage of the topography, sloping upward rather sharply to the east. The proposed design of the several buildings seeks to create a pleasing single family dwelling, rather than institutional, atmosphere.

## I

### THE LEASE

Municipal action commenced with the Council's resolution of January 2, 1969 declaring it to be in the best interests of the city and its residents to cooperate with GEHC by entering into a ground lease for both projects, referring the proposal to the Planning Board for consideration, and directing the City Solicitor to prepare a lease on certain generally indicated terms. Thereafter the Planning Board advised the governing body, by resolution, of the need to make land available for governmentally financed housing to replace substandard housing in the city and that there was no municipal need or use for the land requested by GEHC other than the proposed housing development. On February 24, 1969 the Council held a public meeting in the nature of a hearing at which GEHC presented its proposal in detail to it and the citizenry. At a council meeting on May 27, following

the approval of the use variance, the lease was approved, authorized and executed. Contingent upon the obtaining of financing and zoning relief by GEHC, as well as compliance with all other applicable laws and ordinances, it recites the public purpose of the project and provides for a maximum term of 50 years at an annual rental of $1000, plus a payment of 15% of annual gross shelter rents in lieu of taxes.

There is no question of the right and authority of the city to enter into such a lease or of the validity of its terms and plaintiffs do not argue to the contrary in this court. The contentions they do make in seeking to void it are completely frivolous. It does not constitute an illegal contract to zone nor is it unlawful because the "financial and professional responsibility" of GEHC, an allegedly "irresponsible tenant", to construct, operate and manage the project were not examined before the agreement was entered into. Suffice it to say as to the latter that the state and federal financing agencies have the obligation to be assured of the ability of the applicant to oversee construction and themselves to supervise maintenance and operation. See *e. g., N. J. S. A.* 55:14J–8(b); 55:14J–9(b); 55:16–11; 55:16–14. The contention, as to this and other aspects of governmental action, that the Mayor (who is a member of the Planning Board, but not, under Englewood's form of government, a voting member of the governing body) and other city officials are guilty of a vitiating conflict of interest because they campaigned for office on a platform favoring the project or previously expressed approval of it is utterly without merit. Such is not the personal, disabling conflict of interest prohibited by our cases. The trial court was eminently correct in sustaining the lease.

## II

### THE VARIANCES

The one issue which is novel and important is the basis for the grant of the use variance.

The pertinent section of the zoning enabling act, *N. J. S. A.* 40:55–39(d) authorizes the grant of a use variance upon an affirmative finding of "special reasons" "in particular cases", together with the negative findings, applicable in all zoning relief situations, that the "relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."

It is long settled law in this state that this unique provision does not require that the particular premises cannot feasibly be used for a permitted use or that other hardship exists. "Special reasons" is a flexible concept; broadly speaking, it may be defined by the purposes of zoning set forth in *N. J. S. A.* 40:55–32, which specifically include promotion of "health, morals or the general welfare." *Ward v. Scott,* 11 *N. J.* 117 (1952). So variances have been approved for many public and semi-public uses because they significantly further the general welfare. See, *e. g., Andrews v. Board of Adjustment of the Township of Ocean,* 30 *N. J.* 245 (1959) (parochial school in residential zone); *Black v. Montclair,* 34 *N. J.* 105 (1961) (additional parochial school building in residential zone); *Burton v. Montclair,* 40 *N. J.* 1 (1963) (private school in residential zones); *Yahnel v. Board of Adjustment of Jamesburg,* 79 *N. J. Super.* 509 (App. Div. 1963), *cert. den.* 41 *N. J.* 116 (1963) (telephone equipment building in residential zone); *Kunzler v. Hoffman,* 48 *N. J.* 277 (1966) (private hospital for emotionally disturbed in residential zone). Compare *Kohl v. Mayor and Council of Borough of Fair Lawn,* 50 *N. J.* 268 (1967); *Mahler v. Board of Adjustment of Borough of Fair Lawn,* 94 *N. J. Super.* 173 (App. Div. 1967), *aff'd o. b.* 55 *N. J.* 1 (1969).

The conclusions of the Board of Adjustment and the governing body in this regard are fully supported by the very comprehensive proofs before the Board, and are worthy of full quotation. The Board said:

Without regard, however, to any official federal or state requirements, the Board finds and concludes that the demand of public policy cannot be satisfied by continued confinement of non-white families in the Fourth Ward area, and that breaking the long-standing patterns of racial segregation in this city will promote the general welfare of the community. The Board further finds and concludes that the program in question will serve to alleviate urban blight; to promote the health, morals and general welfare of the residents of this City; and to encourage appropriate land use throughout the City. * * *

The Council adopted the Board's findings and added:

2. The Council of the City of Englewood further finds that the provision of low and moderate income housing by means of a governmentally financed housing program undertaken by the Greater Englewood Housing Corporation as a non-profit qualified housing sponsor which housing is limited to cluster-type units not exceeding two stories in height serves the general welfare of the City of Englewood which has for some time last past suffered from a desperate housing shortage for low and moderate income families residing within the City of Englewood and that the present condition of low and middle income families being forced to live in substandard, unsafe and unsanitary dwellings which are in need of major repairs or are unfit for residential use or are overcrowded constitute a condition detrimental to the health, safety, morals, welfare, and reasonable comfort of all of the people of the City of Englewood and that the amelioration of this condition will result from the granting of the requested variance and thereby promote the health, safety, morals and general welfare of the City of Englewood.

3. The Council of the City of Englewood further finds that the granting of the variance requested with respect to the aforementioned premises will together with the granting of the variance applied for in the companion application heretofore referred to, will result in a racially balanced housing program in that governmentally financed low and moderate income housing will be constructed both within and without the impacted area of the Fourth Ward of the City of Englewood and the Council further finds that freedom of choice of residents of the impacted area of the Fourth Ward to reside within or without said area in safe, decent and attractive housing that they can afford serves the community's interest in achieving an integrated, just and free society and promotes the general welfare of all citizens.

Also of importance in this connection is the legislative determination set forth in *N. J. S. A.* 55:16–2 of the statute under which GEHC was incorporated:

It is hereby declared that there is a severe housing shortage in the State; that there are places in many municipalities of the State where dwellings lack proper sanitary facilities and are in need of major repairs or unfit for residential use; that these conditions are detrimental to the health, safety, morals, welfare and reasonable comfort of the people of the State; that these conditions reduce economic values and impair private investments and public revenues; that the improvement of these conditions requires the production of new dwellings at rents which the families who need housing can afford; that the creation of the agencies and corporations hereinafter described, is necessary and desirable for this purpose; that the provision of housing to make possible and to assist the clearance, planning, development or redevelopment of blighted areas, as proposed in this act, is a public purpose and a public use for which public money may be spent and private property acquired; and that the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination.

█ Plaintiffs challenge these conclusions as insufficient to constitute "special reasons". Judge Trautwein held that they were legally adequate and we thoroughly concur. We specifically hold, as matter of law in the light of public policy and the law of the land, that public or, as here, semi-public housing accommodations to provide safe, sanitary and decent housing, to relieve and replace substandard living conditions or to furnish housing for minority or underprivileged segments of the population outside of ghetto areas is a special reason adequate to meet that requirement of *N. J. S. A.* 40:55-39(d) and to ground a use variance.

█ Plaintiffs also challenge the agencies' findings that the negative criteria were not factually and legally met. The Board found that, "by reason of the location, topography and isolation of the tract in question, as well as the design and layout of the structures proposed to be erected, such adverse effect as the proposed multi-family use may have on nearby one-family uses will be minimal, and that the relief requested may, accordingly, be granted without substantial detriment to the public good and without substantial impairment of the intent or purpose of the zone plan or zoning ordinance." The governing body concluded that this finding was supported by

the evidence. The trial court agreed and we think the conclusion is irresistible in the light of the proofs.

Indeed, we should observe, parenthetically, that courts rarely find land use cases where the evidence before local bodies is as comprehensive and as thoroughly presented and where, procedurally, hearings and other proceedings are as fairly, fully and meticulously conducted and resolutions and ordinances as well prepared as was done in the instant situation.

█ Finally, plaintiffs urge that the use variance is invalid as constituting rezoning without legislative action. Stress is laid on the 10 acre size of the tract. While a zoning amendment specifically changing the use of the site (some of the zoning ordinance's multi-family districts appear to be no larger) or providing for the use as a special exception under *N. J. S. A.* 40:55–39(b) would have been appropriate as well, the size of the site does not preclude a use variance under the circumstances. See *Kunzler v. Hoffman, supra* (48 *N. J.* 277) (40 acre tract) ; *Roman Catholic Diocese of Newark v. Borough of Ho-Ho-Kus*, 47 *N. J.* 211 (1966) (20 acre school site). *Leimann v. Board of Adjustment of Township of Cranford*, 9 *N. J.* 336 (1952), relied on by plaintiffs is not apposite. At that time (d) of section 39 had not been enacted in its present form and a use variance applicant had to establish hardship.

In sum, the use variance was properly granted. In fact, a denial of it under the circumstances and proofs could not well be sustained.

█ Little need be said about the bulk variance granted under *N. J. S. A.* 40:55–39(c), which authorizes a variance from yard, setback, height and similar restrictions caused by exceptional site situations or conditions which would otherwise result in peculiar and exceptional practical difficulties and hardship. There is some doubt whether it was required at all, since the use variance granted approval of the specific project, the full layout of which was before the Board of Adjustment on that occasion. The relief granted

by the (c) variance was from requirements which fitted single-family dwellings but made no sense for a multi-family culster-type project on a large, hilly, rocky site. If required at all, it was in fact essential by reason of the use variance previously allowed. We see nothing improper about it.

## III

## OTHER MATTERS

Plaintiffs' contentions with respect to the previously listed issues tendered by the second and third captioned suits are so devoid of merit as to require only passing comment. Each was carefully passed upon by the trial judge and we agree with his conclusions. We are constrained to say that they partake more of harassment under plaintiffs' course of continuous opposition to the project than of *bona fide,* legally significant objections.

These contentions revolve around mere details of the layout and development of the project site, taking form as preliminary and final subdivision approvals, site plan approval and certain ordinances affecting these details. Compliance with the mechanics of subdivision approval under the subdivision ordinance was apparently felt necessary because the tract consisted of a large number of individual lots on the tax map which were assembled, so to speak, to make up the site and therefore, under the terms of the ordinance, constituted an affected "re-subdivision." It is the converse of the conventional situation intended by subdivision regulations where a developer of raw land seeks to divide the property into lots, lay out streets, construct dwellings, sell the houses individually and turn over the improvements to the municipality for future maintenance. Here the site was to remain in one ownership for a lengthy term and by the terms of the lease GEHC was obligated to construct and maintain (except as to road repair) all on-site improvements, including sewers, utilities and interior access ways. We find

nothing legally objectionable or not within the discretion of the Planning Board and Council in the subdivision and site plan approvals, either procedurally or on the merits. They appear to have been most carefully considered, all requirements were substantially met, and the conditions imposed are sufficient to protect the public interest.

In particular, we are of the view that ordinance No. 1820, amending the subdivision ordinance to authorize the Planning Board to waive the requirement of a performance bond in lieu of completion of required subdivision improvements, if the applicant is a public or non-profit housing sponsor and if the Board finds that the project is financed with public funds and is subject to adequate supervision by a governmental agency, to be a perfectly valid exercise of municipal power. Likewise the waiver by the Board here was a proper exercise of discretion. It is not sensible and not required for the public interest to impose the expense of a performance bond in circumstances where the financing federal and state agencies are obligated to see that the sponsor constructs and develops the project in accordance with plans which they have approved.

The last matter to be mentioned is the validity of ordinance No. 1819. The original filed map of the whole Trumbull Park area showed a paper street called Phelps Avenue running easterly through the tract from Broad Avenue. The map filing constituted an irrevocable offer to dedicate the street and thereby the public acquired rights therein, the exact extent of which need not be examined. The street was never actually opened, improved or accepted by the city. The portion in question lies within Trumbull Park itself and since the creation of the park has continued to be shown as a street on the official and other city maps. In our view, the creation of the park did not amount to a rejection of the offer to dedicate and the public rights in the street within the park remained. The city, in the lease to GEHC, contracted to vacate all paper streets within the project site and to provide, at its expense, a direct access

road from Broad Avenue to the westerly boundary of the site. It proposed to do the latter by vacating the public rights in Phelps Avenue within Trumbull Park and relocating and improving it as a public access road out of park lands on the southerly edge thereof. Ordinance 1819 so provides. We are of the opinion that the ordinance is authorized by *N. J. S. A.* 40:60–38, which permits "any municipality having acquired land or any estate or interest therein less than a fee simple absolute, used or having been or to be used in rendering service to the public, * * * at any time [to] convert a portion or the whole thereof to any other public use or service * * * ." As the ordinance recites, "said vacation and relocation constitutes the transfer and conversion of lands from public street and highway use [by virtue of the public rights created by the offer to dedicate] to public park use, and from public park use to public street and highway use." The ordinance is not a disposition of municipally owned park lands in violation of the prohibition of *N. J. S. A.* 40:60–27, which refers to sale or alienation to third parties.

The judgments of the Law Division are affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.