Julius FLEISCHMAN, Petitioner,
George C. Papageorge,
Intervenor,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

Hillcrest Homes Associates
LP, Intervenor.

No. 09–AA–1514.

District of Columbia Court of Appeals.

Argued March 3, 2011.
Decided Aug. 25, 2011.

Mark P. Sullivan, New York, NY, for petitioner.

Kenneth H. Rosenau for intervenor-petitioner.

Peter J. Nickles, Attorney General for the District of Columbia, at the time the statement in lieu of brief was filed, and Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and James C. McKay, Jr., Senior Assistant Attorney General, were on the statement in lieu of brief, for respondent.

Mary Carolyn Brown, with whom Whayne S. Quinn and Paul J. Kiernan, Washington, DC, were on the brief, for intervenor-respondent.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

Petitioner, Julius Fleischman, challenges the order of the District of Columbia Board of Zoning Adjustment (hereafter "BZA" or "The Board") granting special exception and area variance relief for the purpose of building a residential development containing 54 one-family detached dwellings on a 12.59–acre property located in the Southeast quadrant of the District. Petitioner argues that the BZA exceeded its authority and erred in determining that

the property owners were entitled to the relief requested.[1] We affirm.

## I. Procedural Background

On June 2, 2008, Hillcrest Homes Association LP (HHALP) filed an application with the BZA proposing to construct a residential development containing 54 one-family detached dwellings located in the R–1–B zone district,[2] on a triangle-shaped property of approximately 12.59 acres, situated along the District's southern border with Prince George's County, between Branch Avenue and Naylor Road.[3] The property is currently heavily wooded and has a rise of more than 100 feet from the southeast to the northwest. The application sought the necessary variances to cluster the construction of the 54 one-family detached dwellings on the southern portion of the property, leaving a sizeable part of the property undeveloped. The principal variance requested was to reduce the minimum lot area from the allowed as of right 5,000 square feet to lots varying from 1,955 square feet to 3,385 square feet. Variances related to the reduced lot size were sought for the minimum required front, rear and side yards, as well as permission to build 23 of the houses to four stories instead of the allowed three, but without an increase in the allowed overall height. The total number of variances amounts to 241, given the number of individual lots, but approximately 4.69 acres of the property would remain in its present undeveloped wooded state.[4]

The BZA conducted a public hearing concerning the application on November 18, 2008. HHALP presented several witnesses who explained, from HHALP's perspective, the practical difficulties in complying with the zoning regulations. HHALP's representative testified that the property contains a large hill that presents a topographical obstacle to the space and size requirements of the applicable zoning regulations. An expert urban planner also testified on behalf of HHALP about some of the topographical and financial difficulties requiring the variances.

Petitioner was a party opponent at the BZA hearing. As a developer himself, petitioner testified that he was once interested in the subject property and hired surveyors and architects to examine the land. Based on those studies, he objected to the proposed development on a number of grounds. At the conclusion of the hearing, the Board approved HHALP's request for special exception relief and all of the variances by a vote of 5–0, with no abstentions.[5]

1. The District of Columbia did not file a brief in this case and instead relies on the Decision and Order of the BZA and the brief by intervenor HHALP.

2. "The R–1 District is designed to protect quiet residential areas now developed with one-family detached dwellings and adjoining vacant areas likely to be developed for those purposes … The R–1 District is subdivided by different area requirements into R–1–A and R–1–B Districts, providing for districts of low and high density, respectively." 11 DCMR § 200.1, .3 (2000).

3. Southern Avenue runs along the boundary between the District and Prince George's County but ends at Branch Avenue before reaching the property. HHALP's application includes a proposal to complete an extension of Southern Avenue to connect it with Naylor Road, with a dedication to the District of 128,259 square feet of the property to achieve this extension.

4. Related special exceptions were also sought and granted. These are not challenged by petitioner except insofar as they bear on the challenges to the variances themselves.

5. At the hearing, the BZA also accepted into the record government reports from the Office of Planning (OP), the D.C. Department of Transportation (DDOT), the District Department of the Environment (DDOE), and the

Petitioner filed a Motion for Reconsideration on July 2, 2009. Advisory Neighborhood Commission ("ANC") 7B also submitted a Motion for Reconsideration on July 6, 2009.[6] The BZA denied both motions at a public meeting on July 28, 2009, and issued a written order to this effect on November 20, 2009. Petitioner filed a timely Petition for Review to this court. Intervenor-petitioner, George C. Papageorge, was granted intervenor status by this court on March 15, 2010.[7]

## II. Standard of Review

"In reviewing a BZA decision, we must determine (1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings. Generalized, conclusory or *incomplete findings* are insufficient; subsidiary findings of basic fact on all material issues must support the end result in a discernible manner." *Mendelson v. District of Columbia Bd. of Zoning Adjustment,* 645 A.2d 1090, 1094 (D.C. 1994) (emphasis in original) (quotations and citations omitted).

"We will not reverse [the BZA's decision] unless its findings and conclusions are '[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;' in excess of its jurisdiction or authority; or '[u]nsupported by substantial evidence in the record of the proceedings before the Court.'" *Economides v. District of Columbia Bd. of Zoning Adjustment,* 954 A.2d 427, 433 (D.C.2008) (quoting *Mendelson, supra,* 645 A.2d at 1094 and D.C.Code § 2–510(a)(3) (2001)). "An agency's interpretation of the regulations that govern it must be accorded great weight, and must be upheld unless it is plainly erroneous or inconsistent with the regulations. At the same time, where the agency's final decision rests on a question of law, the reviewing court has the greater expertise, and the agency decision is therefore accorded less deference." *Id.* (quotations and citations omitted).

In accordance with this standard, we proceed to review the BZA's grant of HHALP's application.

## III. BZA's Authority

Petitioner stresses the size of the property and the number of requested vari-

---

D.C. Fire and Emergency Services Department. The BZA summarizes each of these reports in its Decision and Order; each of the agencies recommended approval of the project.

6. "Issues raised before the BZA by an ANC are accorded special status. The BZA is required by the D.C.Code and its own organic regulations to give issues and concerns raised by the ANC 'great weight,' and to discuss those issues 'in the written rationale for the governmental decision taken.'" *Levy v. District of Columbia Bd. of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990) (quoting D.C.Code § 1–261(d); 11 DCMR § 3307.2). Representatives of the ANC appeared at the hearing and their concerns were specially addressed by the BZA in both the original order and in the order denying reconsideration.

7. Petitioner Fleischman lives on a property adjacent to the proposed development site and testified that the project would result in four homes being built against the boundary of his backyard. Intervenor-petitioner Papageorge lives five blocks from the property. The BZA allowed Papageorge to testify at the hearing in part because Papageorge explained that he had been working closely with Fleischman on this project and because Fleischman has a visual impairment, Papageorge read many parts of Fleischman's statements at the hearing. However, the BZA did not grant Papageorge party status at the hearing because his home would not be impacted by the HHALP's application.

ances in arguing that the BZA exceeded its authority when it granted HHALP's application. Petitioner emphasizes that HHALP requested variances for all but two dimensions of the proposed dwellings, which, in his view, meant that the BZA's approval impacted almost every applicable zoning requirement of the property. In so doing, petitioner contends that the BZA exceeded the scope of its authority defined in D.C.Code § 6–641.07(e), which provides that the BZA "shall not have the power to amend any regulation or map." According to petitioner, the net effect of approving all of HHALP's requested variances in this manner was a *de facto* rezoning of the property, which can only be done by the Zoning Commission. *See* D.C.Code § 6–641.01 (2001).[8] As we have said elsewhere,

> The powers of the BZA are those defined by statute and regulation. *Spring Valley [Wesley] Heights Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 644 A.2d 434, 436 (D.C. 1994). Specifically, the Board is authorized to "make special exceptions to the provisions of the zoning regulations in harmony with their general purpose and intent." D.C.Code § 6–641.07(d) (2001).

The Board also has appellate authority to "hear and decide, in accordance with the provisions of the regulations adopted by the Zoning Commission, requests for[, *inter alia*,] special exceptions." D.C.Code § 6–641.07(g)(2) (2001). The Zoning Regulations vest the Board with "original jurisdiction to grant variances ... and special exceptions ... and to exercise all other powers authorized by the Zoning Act of 1938, [as amended,] ... D.C.Code §§ 6–641.01 to 6–641.15." 11 DCMR § 3100.1 (2003).

*President & Directors of Georgetown Coll. v. District of Columbia Bd. of Zoning Adjustment*, 837 A.2d 58, 68 (D.C.2003).

Here, according to the BZA, HHALP's application requested "a variance from the maximum number of building stories under 11 DCMR § 400, a variance from the lot area and width requirements under § 401, a variance from the rear yard requirements under § 404, a variance from the side yard requirements under § 405, a special exception to permit two or more principal buildings or structures on a single subdivided lot under § 2516,[9] and a variance from the requirement of § 2516.5[10] that theoretical lots allowed

---

**8.** Petitioner specifically emphasizes comments by BZA member Jeffries at the public hearing on November 18, 2008, wherein Jeffries suggested that the BZA is a regulatory board with the authority to determine how to "grow the city" and that it could have approved even more units that HHALP requested. According to petitioner, these comments provide the "smoking gun" to demonstrate that BZA acted arbitrarily and capriciously in approving the application We do not think a comment by one BZA member can have such weight. We focus on what the BZA actually did.

**9.** "If approved by the Board of Zoning Adjustment as a special exception under § 3104, two (2) or more principal buildings or structures may be erected on a single subdivided lot, subject to the provisions of this section." 11 DCMR § 2516.1.

**10.** "If a principal building has no street frontage, as determined by dividing the subdivided lot into theoretical building sites for each principal building, the following provisions shall apply:
(a) The front of the building shall be the side upon which the principal entrance is located;
(b) Open space in front of the entrance shall be required that is equivalent either to the required rear yard in the zone district in which the building is located or to the distance between the building restriction line recorded on the records of the Surveyor of the District of Columbia for the subdivided lot and the public space upon which the subdivided lot fronts, whichever is greater;
(c) A rear yard shall be required; and
(d) If any part of the boundary of a theoretical lot is located in common with the rear

pursuant to § 2516 provide open space in front of the building entrances to construct a new residential development consisting of 54 one-family detached dwellings" on a five-parcel property in the R–1–B District. We, therefore, see no reason why, according to the explicit terms of D.C.Code § 6–641.07 and its associated regulations, the types of relief requested by HHALP were not properly before the BZA.

We are unpersuaded by petitioner's argument that, on the basis of these facts, the size of the property or the number of variances requested should—by themselves—impact our analysis of whether the BZA had authority to preside over this application.[11] The nature of the relief re-

quested by HHALP is—as we discuss more fully in Part IV—allowing a concentration of the one-family detached dwellings on the property with some dimensional modifications, but otherwise in keeping with the character of the R–1–B zone.[12]

We therefore proceed to analyze whether the BZA acted in accordance with the applicable standards in granting the HHALP's area variance requests.

## IV. The Area Variances

HHALP requests only area variances, and not any more demanding use variance. D.C.Code § 6–641.07(g)(3) provides that the BZA may grant a variance

lot line of the subdivided lot of which it is a part, the rear yard of the theoretical lot shall be along the boundary of the subdivided lot."

11 DCMR § 2516.5.

**11.** Neither petitioner nor intervenor-petitioner cite any authority from our case law to support their assertion that the approval of so many variances constitutes a *de facto* rezoning by the BZA. We note several cases from outside our jurisdiction which take up the question of whether size of property or number of variances requested, by themselves, constitute a rezoning. *See DeSimone v. Greater Englewood Hous. Corp. No. 1*, 56 N.J. 428, 267 A.2d 31, 39 (1970) ("While a zoning amendment specifically changing the use of the site ... would have been appropriate as well, the size of the site does not preclude a use variance under the circumstances."). *Cf. Drews v. City of Hattiesburg*, 904 So.2d 138, 141 (Miss.2005) ("We have never limited the number of variances which can be requested at a given time, and we will not do so in this opinion. However, the changes proposed in the six variances are so dramatic that they constitute a rezoning to B–3, two levels beyond the B–1 (professional business district) lots in question."); *Von Gerichten v. Schermerhorn*, 49 Misc.2d 800, 268 N.Y.S.2d 589 (N.Y.Sup.Ct.1966) (remanding to board of zoning appeals for further findings and conclusions after the board had denied an application on the basis that "to allow the fourteen

exceptions in a row as being tantamount to rezoning, a function beyond its capacity" because court found that the board does have "the jurisdictional ability to do so without invading the exclusivity of the legislative rezoning power.").

**12.** For its part, HHALP concedes that the courts have found that impermissible rezoning occurs when the BZA (or comparable zoning body in another jurisdiction) eliminates an otherwise permitted use in its entirety, authorizes a use not allowed in a particular zone district, or approves a dramatic increase in permitted density. *See George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment*, 831 A.2d 921, 949 (D.C.2003) (holding that BZA exceeded its authority when it prohibited the University from using Foggy Bottom acquisitions to count towards its undergraduate housing goal); *see also Village of Newburg v. Trenton*, 321 Wis.2d 424, 773 N.W.2d 500, 506 (App. 2009) (holding that Town committed *de facto* rezoning when during a zoning moratorium it approved a nonconforming use permit to build a commercial building in residential zone); *Township of North Brunswick v. Zoning Bd. of Adjustment*, 378 N.J.Super. 485, 876 A.2d 320, 326 (App.Div.2005) (holding that Board usurped its authority when it approved a luxury apartment building that grossly exceeded the Township's allowance of only single family detached homes in that zone).

[w]here, by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of the original adoption of the regulations or by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation adopted under this subchapter would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such difficulties or hardship, provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map. . . .

See also 11 DCMR § 3103.2. This court has distilled a three-part test that "[i]n order to obtain [area] variance relief, an applicant must show that (1) there is an extraordinary or exceptional condition affecting the property; (2) practical difficulties will occur if the zoning regulations are strictly enforced; and (3) the requested relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan. . . ." *Washington Canoe Club v. District of Columbia Zoning Com'n,* 889 A.2d 995, 1000 (D.C. 2005); *see also The Oakland Condomini-*

*um v. District of Columbia Bd. of Zoning Adjustment,* 22 A.3d 748, 752 (D.C.2011).[13]

Petitioner and intervenor focus their objections on the BZA's analysis of the uniqueness and practical difficulties prongs of the variance test; we will address each in turn.

### A.  Uniqueness

In *Gilmartin v. District of Columbia Bd. of Zoning Adjustment,* 579 A.2d 1164, 1168 (D.C.1990), we explained the uniqueness test at length:

[T]he rationale behind the uniqueness test is that difficulties that are common to or affect an entire neighborhood, or a substantial portion thereof, are properly addressed by seeking amendment of the regulations themselves from the Zoning Commission . . . If such problems were addressed through individual variances, the effect would be a *de facto* amendment of the zoning regulations by BZA because requests by other owners similarly situated would have to be granted as a matter of equal protection under the due process clause.  It is the Zoning Commission, however, not BZA that is empowered to make such amendments to the overall zone plan.

The test follows from its rationale.  To support a variance it is fundamental "that the difficulties or hardships [be] due to unique circumstances peculiar to the applicant's property and not to the general conditions in the neighborhood."

---

13.  We conclude that the record contains ample support for the BZA's determination that HHALP's proposed development did not impair the zoning plan.  The BZA explains that HHALP's "application furthers the zone plan, as well as the Comprehensive Plan for the Nation's Capital, by developing vacant land near a Metro station with a low-density development of zone-appropriate one-family dwellings."  The BZA further concluded that "the surrounding neighborhoods receive benefits due to the development—such as the completion of Southern Avenue—as well as the obvious environmental and aesthetic benefits due to the green space . . . [and] the overall density of the development is less than that permitted in the zone."  Finally, "[t]he greater public good is also positively impacted by this development in that it makes possible the connection of Branch Avenue and Naylor Road through the completion of Southern Avenue."

*Palmer v. Bd. of Zoning Adjustment,* 287 A.2d 535, 539 (D.C.1972), *quoted in Myrick* [*v. District of Columbia Bd. of Zoning Adjustment*], *supra,* 577 A.2d [757] at 760 [ (1990) ]. There is no requirement that the uniqueness "inheres in the land at issue...." [*Capitol Hill Restoration Society v. District of Columbia Bd. of Zoning Adjustment*] *Capitol Hill II, supra,* 534 A.2d [939] at 942 [ (1987) ]. *See also Monaco v. District of Columbia Bd. of Zoning Adjustment,* 407 A.2d 1091 (D.C.1979); *Clerics of St. Viator, Inc. v. District of Columbia Bd. of Zoning Adjustment,* 320 A.2d 291 (D.C.1974). The statute does not preclude the approval of a variance where the uniqueness arises from a confluence of factors. The critical point is that the extraordinary or exceptional condition must affect a single property. (Alterations in original). We conclude that in this instance the BZA properly applied the uniqueness test when it concluded that "the difficulties or hardships" cited by HHALP were "unique circumstances peculiar to the applicant's property." *Palmer, supra,* 287 A.2d at 539. The BZA's Decision and Order demonstrates that it made sufficient factual findings concerning the property's uniqueness, considered as a whole.[14] The BZA concluded that the property is "irregularly shaped and wooded," described in detail its "extreme topography," and discussed the property's "significant grade differential." We have elsewhere affirmed the BZA's determination of uniqueness based upon a "site's irregular shape, steeply sloping grade, the large size and physical configuration...." *French v. District of Columbia Bd. of Zoning Adjustment,* 658 A.2d 1023, 1035 (D.C.1995). In addition, the BZA found that the property had minimal street frontage in comparison to its perimeter of over 3,000 feet, no public street infrastructure, and is encumbered on its southern boundary by a private parking lot, which provides no benefits to the development but reduces the property's "buildable" area.

## B. Practical Difficulties

■ "Determinations of whether 'practical difficulties' exist, like determinations of whether the variance at issue is one of area or use, must be made case-by-case, and must be judicially reviewed under a rule of deference to administrative expertise." *Wolf v. District of Columbia Bd. of Zoning Adjustment,* 397 A.2d 936, 942 (D.C.1979).

■ With respect to area variances, "[i]n order to prove that an applicant suffers from 'practical difficulties' two elements must be proven: The applicant must demonstrate that (1) compliance with

---

14. Petitioners object to the BZA's consideration of the 12.9 acre property as a single unit, but we see no obstacle to such treatment in the circumstances here. By its own terms, HHALP's application requested designation of a "new record lot", to be subdivided into "54 theoretical building sites ranging in size." This record lot would consist of the 419,333 square feet of property remaining after the dedication of 128,259 square feet of property to the District for the Southern Avenue extension. In other words, the subdivision of the property into 54 building sites did not create 54 separate properties, thereby requiring the BZA to conduct 54 separate variance analyses. *See Washington Canoe, supra,* 889 A.2d at 1000 ("The critical point is that the extraordinary or exceptional condition must affect a single property.") (internal citation omitted); *cf. Carliner v. District of Columbia Bd. of Zoning Adjustment,* 412 A.2d 52, 54 (D.C.1980) (affirming BZA's denial of area variance where BZA found "that not until petitioner subdivided the tract consisting of the three lots she had purchased did the portion she retained for herself out of the original tract become substandard under the R–1–B zoning regulation applicable in this general area."). *See also* note 16, *infra.*

the area restriction would be unnecessarily burdensome; and (2) the practical difficulties are unique to the particular property ... Economic use of property has been considered as a factor in deciding the question of what constitutes an unnecessary burden or practical difficulty in variance cases." *Gilmartin, supra,* 579 A.2d at 1170 (quotations and citations omitted).[15] "It is for BZA, in the first instance, to weigh carefully the claims of potential difficulty advanced" by the applicant. *Id.* at 1171.

Petitioner argues that the BZA's finding that HHALP was presented with practical difficulties was not supported by substantial evidence. According to petitioner, there is no evidence in the record demonstrating why HHALP's compliance with the existing zoning regulations would not be economically reasonable. In petitioner's view, in its application and at the hearing, HHALP described the project it wished to construct, but it did not sufficiently explain the practical difficulties beyond just asserting that compliance is "not feasible" or "not reasonable" and did not specifically explaining why the 54 units was the desired and best option, rather than, say, 30 or 40. According to petitioner, HHALP could have—and should have—introduced evidence supporting its claim that compliance with the zoning regulations was "not feasible," such as the purchase price, financial projections, comparative financial scenarios, or costs from development alternatives.

■ To the contrary, we conclude that the record contains sufficient factual findings supporting the BZA's conclusion that HHALP was presented with practical difficulties warranting the area variance relief. The BZA identified several extraordinary and exceptional conditions inherent in the property, including its topography, the acreage devoted to the extension of Southern Avenue, the lack of public street infrastructure, the wooded open space to serve as a buffer, and a parking lot. The record further reflects that the OP submitted a report to the BZA which highlighted these and other practical difficulties, including the property's "challenging slope," and the unfeasibility of extending streets from the north onto the site, thereby—in the OP's view—making HHALP's cluster design choice the most appropriate because it is a more efficient and environmentally-sound use of the land. The OP presented similar testimony at the hearing. While petitioner and intervenor contested these representations, "[t]he mere fact that petitioners presented contrary evidence ... is immaterial. As the trier of fact, the Board may credit the evidence upon which it relies to the detriment of conflicting evidence, and need not explain why it favored the evidence on one side over that on the other." *French, supra,* 658 A.2d at 1035 (quotation and citation omitted).

■ Petitioner perhaps misconceives the variance process to require HHALP to defend every economic aspect of its proposed development design as a *sine qua non* to variance approval. We discern no such absolute obligation in this case from D.C.Code § 6–641.07(g)(3). The BZA is authorized to consider "the weight of the burden of strict compliance," "the severity of the variance(s) requested," and "the effect the proposed variance(s) would have on the overall zone plan." *Gilmartin, supra,* 579 A.2d at 1171. We are satisfied

---

**15.** It is well-established in our case law that "the higher 'undue hardship' standard applies to requests for use variances while the lower 'practical difficulty' standard applies to area variances." *Gilmartin, supra,* 579 A.2d at 1170 (citing *Palmer v. Bd. of Zoning Adjustment,* 287 A.2d 535, 541–42 (D.C.1972)).

that the BZA carefully weighed these factors in granting HHALP's application. The BZA considered the OP's analysis and found that denying the variances for the front and side yards would only prompt a need for other variances, including a variance to narrow private roads, and that the steep slope of the property made it difficult to comply with the home height requirements. The BZA further concluded that the "[c]onstruction activities on the northern portion of the property ... could only be accomplished with greatly increased effort and expense on the part of Applicant" and acknowledged the financial difficulties that would be incurred based upon the common sense principle that construction costs on a site with extreme topographical changes would be higher than on a site without those changes. Finally, the BZA considered HHALP's proposed 54 unit development to be "thoughtfully laid out and designed," and "represent[ing] a reasonable density of development." [16]

The BZA assessed the severity of the variances requested to be minor relative to the hardships inherent in the property. The BZA noted that "none of the sites/dwellings need relief from the maximum lot occupancy of 40% mandated for this R–1–B zone ... nor from the maximum building height of 40 feet mandated in the zone." In fact, as the BZA explained, many of the requested variances were born from HHALP's considerations of "the zone plan" and the development's impact on the surrounding areas, including leaving a portion of the property undeveloped "to buffer the already-existing neighborhoods from potential adverse impacts of the development" and increasing recreational opportunities, constructing a private road and alley to provide access for emergency and trash disposal vehicles, and improving the flow of traffic by completing Southern Avenue. In light of these and other aspects of HHALP's proposal, the BZA reasonably concluded that the "clustering of the development on the southern/southeastern half of the property is a reasonable response to the property's topographical constraints as well as to the community's desire to open space along the northern boundary of the property."

Accordingly, and for the foregoing reasons, the agency's decision is.

*Affirmed.*

---

**16.** Petitioner also challenges the BZA's calculation of "the overall low density of the development—54 one-family dwellings where 66 could be constructed without variance relief if spread throughout the property." While the parties debate the precise accuracy of this figure, it appears to be one reasonably arrived at, if only approximate, taking into account the exclusion of the dedicated portion, thus leaving 9.62 acres for the development of 5,000 square foot lots. We therefore see no reason why BZA's characterization of the density of HHALP's proposed development does not "rationally flow" from its findings.