*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No.  13-AA-1309

GUY DURANT, ET AL., PETITIONERS,

V.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

901 MONROE STREET, LLC, INTERVENOR.

Petition for Review of an Order of the
District of Columbia Zoning Commission
(ZC10-28(1))

(Argued June 20, 2014                              Decided September 11, 2014)

*David W. Brown* for petitioner.

*Irvin B. Nathan*, Attorney General for the District of Columbia, with whom *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, filed a statement in lieu of brief.

*Paul A. Tummonds, Jr.*, with whom *Cary R. Kadlecek* was on the brief, for intervenor.

Before BECKWITH and MCLEESE, *Associate Judges*, and NEWMAN, *Senior Judge*.

Concurring opinion by *Senior Judge* NEWMAN at page 23.

MCLEESE, *Associate Judge*: In the order under review, the Zoning Commission approved a Planned Unit Development ("PUD"). Petitioners, a group of individuals who live in the immediate area of the proposed development, challenge the Commission's decision, arguing among other things that the Commission failed to adequately explain its conclusions. We agree, and we therefore remand the case for further proceedings.

## I.

In November 2011, intervenor 901 Monroe Street, LLC applied for approval of a PUD and related zoning changes in connection with the proposed development of a parcel of land measuring approximately 60,000 square feet located in the 900 block of Monroe Street NE. In determining whether to grant the application, the Commission was required to consider the District of Columbia's Comprehensive Plan, which establishes a "broad framework intended to guide the future land use planning decisions for the District." *Wisconsin-Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.2d 382, 394 (D.C. 2011). The Comprehensive Plan "[g]uide[s] executive and legislative decisions on matters affecting the District and its citizens." D.C. Code § 1-306.01 (b)(1) (2012 Repl.). It contains city-wide regulations, including the Land Use Element, which

"establishes the basic policies guiding the physical form of the city . . . and provides direction on a range of development, conservation, and land use compatibility issues." 10-A DCMR § 300.1 (2014) (LU-Overview). The Comprehensive Plan also contains neighborhood-specific regulations -- the ten Area Elements -- that "referenc[e] specific neighborhoods, corridors, business districts, and local landmarks" and that are "intended to provide a sense of local priorities" for particular parts of the District. 10-A DCMR § 104.6 (2014). The parcel at issue is located in the Upper Northeast Area. 10-A DCMR § 2400.6 (2014) (UNE-Overview). The Future Land Use Map ("FLUM") visually represents the land-use policies reflected in the Land Use Element. 10-A DCMR § 225.1 (2014). The General Policy Map ("GPM") visually represents how land use may change between 2005 and 2025 and is used "to guide land use decision-making" in conjunction with the Comprehensive Plan and the FLUM. 10-A DCMR § 223.1, .2 (2014).

At the time the developer submitted its application, several detached residential houses and a two-story commercial building stood on the parcel.[1] Six row houses were adjacent to the parcel along 10th Street NE. The parcel was

---

[1] Although the Commission at one point suggested that four residential houses stood on the parcel, it appears to be undisputed in this court that five residential houses stood on the parcel. We use the latter figure in this opinion.

zoned in part for R-2 residential use ("one-family, semi-detached dwellings") and in part for C-1 commercial use ("neighborhood shopping"). *See generally* 11 DCMR § 105.1 (a)(2), (d)(1) (2014). The FLUM designates part of the parcel for low-density mixed use, part of the parcel for moderate-density mixed use, and more than half of the parcel for low-density residential use. The GPM designates the parcel as a Neighborhood Conservation Area, a category used for primarily residential areas in which development is "[l]imited . . . [and] small in scale." 10-A DCMR § 223.5 (2014). The Land Use Element encourages the preservation and protection of low-density neighborhoods and discourages the replacement of homes in good condition with larger new homes or apartment buildings. *See* 10-A DCMR § 309.10, .11, .13 (2014) (LU-2.1.5, -2.1.6, -2.1.8).

The parcel is located about two blocks from the Brookland/CUA Metro station. The Land Use Element encourages development near Metro stations, 10-A DCMR § 306.1 to .10 (2014) (LU-1.3, -1.3.1), although "[t]his policy should not be interpreted to outweigh other land use policies which call for neighborhood conservation." 10-A DCMR § 306.10 (LU-1.3.1); *see also* 10-A DCMR § 306.14 (2014) (LU-1.3.5) (development adjacent to Metro stations should "respect the character, scale, and integrity of adjacent neighborhoods"). More specifically, the Upper Northeast Area Element encourages development around the

Brookland/CUA Metro station, while also encouraging the protection of the residential character of the Brookland neighborhood. 10-A DCMR § 2408.2, .4 (2014) (UNE-1.1.1, -1.1.3). Most specifically, the Upper Northeast Area Element states that "[s]pecial care must be taken to protect the existing low-scale residential uses along and east of 10th St. NE . . . ." 10-A DCMR § 2416.3 (2014) (UNE-2.6.1).

The developer initially sought to construct an apartment building containing 215 to 230 residential units, but the Commission ultimately approved 205 to 220 residential units. The proposed building would occupy 75% of the parcel and would be approximately sixty-one feet high (six stories). The developer planned to lease the ground floor to six to eight commercial tenants. The five residences and the small commercial building on the property were to be torn down.

A group of residents living within 200 feet of the parcel ("the 200-Footers") objected to the proposed development. Among other things, they argued that the project would be inconsistent with the Comprehensive Plan and that the developer needed to modify the project to comply with the project site's existing moderate-density designation.

In June 2012, the Commission approved the application and zoning changes, concluding that the project as a whole would be consistent with the Comprehensive Plan, including the Land Use Element, the FLUM, and the Upper Northeast Area Element.

The 200-Footers petitioned this court for review of the Commission's order. We concluded that the Commission had failed to adequately address contested material issues, and we remanded for the Commission to make findings and related conclusions of law on three specific topics: (1) whether the project would be consistent with the Comprehensive Plan as a whole in light of the FLUM; (2) whether the project would be consistent with certain specific Comprehensive Plan policies; and (3) whether the project would be consistent with the Comprehensive Plan in light of the GPM's designation of the parcel as a Neighborhood Conservation Area. *See Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1171-72 (D.C. 2013) ("*Durant I*").[2] We also directed the Commission to "[m]ake any other necessary findings of fact and conclusions of law . . . ." *Id.* at 1172.

---

[2] We identified four land-use policies the Commission should explicitly address: LU-2.1.6 (Teardowns), LU-2.1.8 (Zoning of Low and Moderate Density Neighborhoods), LU-2.3.1 (Managing Non-Residential Uses in Residential Areas), and UNE-1.1.1 (Neighborhood Conservation). *Durant I*, 65 A.3d at 1170-71.

On remand, the Commission asked the developer to draft a proposed order making the findings, determinations, and explanations required by this court. The Commission additionally permitted the 200-Footers and other interested parties to submit responses identifying alleged errors or omissions in the proposed order.

The developer submitted a nine-page proposed order, relying heavily on the premise that the project would be a moderate-density mixed use. The 200-Footers filed a fourteen-page response, raising numerous objections to the proposed order submitted by the developer. Among other things, the 200-Footers argued that the project would actually be a medium-density use and for that reason would be inconsistent with numerous aspects of the Comprehensive Plan.

In July 2013, the Commission reapproved the project and zoning changes, issuing an order that adopted the developer's proposed order essentially verbatim. First, the Commission concluded that the project would not be inconsistent with the Land Use Element (10-A DCMR §§ 300-318), because the project's design "respects the character, scale, and integrity of the adjacent neighborhoods." The Commission found that features of the project -- such as the "step-down" design, which sets back the topmost floor -- avoided dramatic contrasts between the

project and the single-family residences nearby. Acknowledging that the FLUM discouraged tearing down existing residential homes to build large multi-family buildings, the Commission found that the demolition of existing residential homes on the parcel "is necessary in order to complete the Project . . . [and] on balance [is] outweighed by the benefits that will accrue to the neighborhood and the city by advancing the land use policies that support development of the Project . . . ." The Commission found that the project would foster economic and civic development around the Metro station, provide new and affordable housing, create open spaces and environmental benefits, use land efficiently, and generate revenue for the District.

Second, the order concluded that the project would not be inconsistent with the Upper Northeast Area Element (10-A DCMR §§ 2400-2417), which encourages moderate-density mixed-use development in the vicinity of the Brookland/CUA Metro station but also requires the Commission to take special care to protect the low-scale residential uses along and east of 10th Street NE. Categorizing the project as "a Moderate-Density Mixed-Use development," the Commission found that the project's design would "respect and protect the low-scale residential character of the surrounding neighborhood, particularly along 10th Street." Acknowledging the special status afforded houses along 10th Street NE,

the Commission nevertheless stated that "the policy [to preserve that area's character] does not advise that no development should occur along 10th Street."

Third, the Commission found that although the majority of the parcel was designated under the FLUM for low-density residential uses, the project would not be inconsistent with the FLUM (10-A DCMR § 225). The Commission explained that the height and density limitations placed on the project "mitigate . . . the potential adverse impacts from the imposition of Moderate-Density Mixed-Use" and that competing policies outweighed the goal of protecting the low-density residential uses.

Finally, the Commission concluded that the project would not be inconsistent with the GPM and its designation of the parcel as a Neighborhood Conservation Area. The Commission stated that the project would be compatible with the existing scale and architectural character of the area. The Commission emphasized that the GPM "is not a zoning map" and that "[a] site's designation on the GPM is not dispositive for how the land should be used." Acknowledging the policy that development of Neighborhood Conservation Areas should "be modest in scale," the Commission stated that the parcel's location within a Neighborhood

Conservation Area did not alter the Commission's conclusion that the project would not be inconsistent with the GPM.

Because the Commission's order was adopted essentially verbatim from the developer's proposed order, which was submitted before the 200-Footers submitted their extensive objections to the proposed order, the Commission's order makes no specific reference to the objections of the 200-Footers, stating only that the 200-Footers had been afforded an opportunity to object. More specifically, the Commission's order does not address the 200-Footers' argument that the project would be a medium-density use rather than a moderate-density use.

The 200-Footers timely petitioned this court for review of the Commission's July 2013 order.

## II.

Generally, "[w]hen reviewing an order of the Commission . . . [we] give great deference to the . . . findings supporting the decision." *Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005). The 200-Footers contend, however, that the order of the Commission on remand in

this case is entitled to no deference, because the Commission adopted the developer's proposed order essentially verbatim, without mentioning the objections the 200-Footers had raised to the proposed order. We share the 200-Footers' concerns about the Commission's order on remand. Although we have not independently verified the precise calculation, we have no reason to doubt the 200-Footers' claim, which the developer does not dispute, that the Commission's order is an approximately 99.9% verbatim adoption of the developer's proposed order. The Commission even adopted almost all of the grammatical and typographical errors in the developer's proposed order. Moreover, the Commission's order does not mention, much less address, any of the 200-Footers' objections to the developer's proposed order.

This court has declined to prohibit the practice of verbatim adoption of orders proposed by one of the parties. *Leftwich v. Leftwich*, 442 A.2d 139, 142 (D.C. 1982). The court has repeatedly noted, however, the difficulties that such adoption can cause. *See, e.g.*, *Otts v. United States*, 952 A.2d 156, 164 (D.C. 2007); *Sacks v. Rothberg*, 569 A.2d 150, 153-54 (D.C. 1990).[3] The court has

---

[3] Many other courts have expressed concerns about the practice of verbatim adoption of findings and conclusions drafted by a party. *See, e.g.*, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing

(continued . . .)

therefore indicated that such adoption will trigger more careful appellate scrutiny and result in less deference to the ruling of the trial court or administrative agency. *E.g.*, *Watergate East Comm. Against Hotel Conversion to Co-Op Apartments v. District of Columbia*, 953 A.2d 1036, 1045 (D.C. 2008) ("We have held that a stricter review of the record is in order when a trial judge adopts, verbatim, the proposals of one party. . . . This principle is applicable to administrative settings.") (internal quotation marks omitted); *Chase v. District of Columbia Alcoholic Beverage Control Bd.*, 669 A.2d 1264, 1266 n.2 (D.C. 1995) (where agency adopted, almost verbatim, proposed findings that had not been properly

_____

(. . . continued)

parties . . . ."); *Berger v. Iron Workers Reinforced Rodmen Local 201*, 269 U.S. App. D.C. 67, 76, 843 F.2d 1395, 1404 (1988) (trial court adopted proposed findings almost verbatim, retaining most typographical errors; "[W]e embrace the view expressed by a number of circuits in strongly disapproving the procedure followed by the trial court in reaching judgment in this case. While [substantially verbatim adoption of] proposed findings does not by itself warrant reversal, it does raise the possibility that there was insufficient independent evaluation of the evidence and may cause the losing party to believe that his position has not been given the consideration it deserves.") (citations and internal quotations omitted); *In re Olga*, 786 N.E.2d 1233, 1236 (Mass. App. Ct. 2003) (trial court adopted proposed findings and conclusions almost verbatim, "even down to typographical errors"; "We have criticized in the past wholesale adoption of findings proposed by one party to the litigation, and we do so again. . . . [S]imply adopting what one side had proposed may lead all parties at least to wonder whether the arguments they made and the evidence they offered were considered [before] the final decision was reached . . . . [Such adoption] substantially diminishes the integrity of the trial process and the respect with which the final result is viewed.").

served on opposing counsel, court was "inclined to accord somewhat less deference to the [agency's] ruling than [the court] ordinarily would").

The court has explained that the more searching inquiry is intended to ensure "that the findings and conclusions ultimately represent the [decisionmaker's] own determinations." *Watergate East*, 953 A.2d at 1045 (internal quotation marks omitted). In this case, the Commission's essentially verbatim adoption, grammatical errors and all, of a proposed order drafted by the developer before the 200-Footers had even been given a chance to respond raises serious concern as to whether the Commission's order actually reflects a considered judgment by the Commission as to the arguments of the parties.

To be clear, we do not mean to suggest any criticism of the practice of soliciting or submitting proposed findings of fact and conclusions of law. Nor do we foreclose the possibility that, after carefully reviewing the findings of fact and conclusions of law proposed by a party in a given case, a judge or agency might "conclude[] that a better document could not have been prepared." *Sacks*, 569 A.2d at 154. We do emphasize, however, that:

> Advocates are prone to excesses of rhetoric and lengthy recitals of evidence favorable to their side but which ignore proper evidence or inferences from evidence

> favorable to the other party. Trial judges are well advised to approach a party's proposed order with the sharp eye of a skeptic and the sharp pencil of an editor.

*Massman Constr. Co. v. Missouri Highway Transp. Comm'n*, 914 S.W.2d 801, 804 (Mo. 1996).

We need not decide, however, whether the Commission's wholesale adoption of the developer's proposed order would by itself warrant reversal in the circumstances of this case, because the Commission's order warrants reversal under ordinary principles of administrative review.

## III.

Where reviewing agency action, we must "consider whether the findings made by the [agency] are sufficiently detailed and comprehensive to permit meaningful judicial review of its decision." *Draude v. District of Columbia Bd. of Zoning Adjustment*, 582 A.2d 949, 953 (D.C. 1990).

> [T]he function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues. The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision.

> There must be a demonstration of a rational connection between the facts found and the choice made.

*Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n*, 979 A.2d 1160, 1173 (D.C. 2009) (internal quotation marks omitted) (brackets in *Foggy Bottom*). We conclude that the Commission has not sufficiently explained two aspects of its decision: (a) the repeated characterization of the project as involving a "moderate density" use, and (b) how approval of the project would be consistent with taking "[s]pecial care . . . to protect the low-scale residential uses along and east of 10[th] Street NE." 10-A DCMR § 2416.3 (UNE-2.6.1).

## A.

On the first issue, the FLUM defines moderate-density residential use as applying to

> the District's row house neighborhoods, as well as its low-rise garden apartment complexes. The designation also applies to areas characterized by a mix of single family homes, 2-4 unit buildings, row houses, and low-rise apartment buildings.

10-A DCMR § 225.4. Although moderate-density residential neighborhoods may include "existing multi-story apartments," such structures were typically "built

decades ago when the areas were zoned for more dense uses (or were not zoned at all)." *Id.* In contrast, the FLUM defines medium-density residential use as applying to "neighborhoods or areas where mid-rise (4-7 stories) apartment buildings are the predominant use." 10-A DCMR § 225.5. Under these definitions, the project would appear to be a medium-density residential use, because it would stand six stories high and offer over two hundred apartment units.[4]

The Commission's explanation of its decision to approve the project relies heavily on the premise that the project would be a moderate-density use. For example, when the Commission concluded that the project would not be inconsistent with the FLUM, it stated that the project would "extend a Moderate-Density Mixed-Use into areas that are designated Low-Density Residential and Low-Density Mixed-Use on the FLUM." Similarly, the Commission's conclusion that the project would not be inconsistent with the Upper Northeast Area Element was based on a finding that the project would be "a Moderate-Density Mixed-Use

---

[4] Because the project also contemplates commercial tenants, it could perhaps be treated under the FLUM as a mixed use. 10-A DCMR § 225.18 to .21. So viewed, however, the residential aspect of the project still apparently would be medium density rather than moderate density. *See* 10-A DCMR § 225.19 (noting that mixed uses may have split designations, such as "Moderate Density Residential/Low Density Commercial").

development" of the type encouraged by the policies applicable to the neighborhood. The characterization of the project as a moderate-density use is also relevant to the Commission's conclusion that the project would not be inconsistent with the GPM because it "is compatible with the existing scale . . . of the area" -- namely, low-density residential use -- and because "applicable written policies . . . encourage moderate-density mixed-use transit-oriented development . . . ."

We conclude that a remand is necessary, for the Commission to address the arguments of the parties concerning whether the project should properly be understood as a moderate-density use; to decide that question and explain the basis for its conclusion; and to address the implications of that conclusion for the questions whether the project would be consistent with the Comprehensive Plan -- including the FLUM, the Upper Northeast Area Element, and the GPM -- and whether the project should be approved.

Both the 200-Footers and the developer object to this disposition of the case. The 200-Footers argue that the Commission "should not be given a third chance to demonstrate its profound disregard of its responsibility to issue decisions with at least the appearance of an exercise of independent judgment in resolving materially

contested issues in the case." The 200-Footers also argue that the project cannot reasonably be viewed as a moderate-density use, that a medium-density project could not lawfully be approved, and that this court therefore should simply rule as a matter of law that the application in its current form must be denied. We understand the 200-Footers' frustration, but we conclude -- as we did in *Durant I*, 65 A.3d at 1167 -- that we are not in a position at this juncture to rule as a matter of law that the project "is invalid on its face as irreconcilable with the Comprehensive Plan." Rather, we remand the matter for the Commission to carry out its responsibility to address the arguments raised by the 200-Footers.

The developer also opposes remand. First, the developer argues that the question whether the project would be a moderate-density use or a medium-density use was settled by *Durant I*. We disagree. The 200-Footers raised the issue in their brief in this court in *Durant I*, arguing that the Commission was incorrect to treat the project as a medium-density use and that that error undermined the Commission's conclusion that the project would be consistent with the Upper Northeast Area Element. This court did not expressly address the issue, however, instead more generally remanding for the Commission to provide a fuller explanation on a number of issues, including whether the project would be consistent with the Upper Northeast Area Element. *Durant I*, 65 A.3d at 1171-72.

We see no basis for a conclusion that *Durant I* decided this contested issue implicitly. *Cf. United States v. Dauray*, 215 F.3d 257, 261 n.1 (2d Cir. 2000) ("We are reluctant to assume that the courts decided this question of law *sub silentio*.").

Second, the developer argues that the FLUM's definitions of medium density and moderate density are not binding on the Commission and that the Commission had the discretion to view the project as a moderate-density use. We express no view on the merits of this argument, because the Commission did not address the issue at all in its order. "[I]t is the rationale of the [agency] that we . . . review, not the *post hoc* rationalizations of . . . counsel. . . . [A]n administrative order can only be sustained on grounds relied on by the agency." *Walsh v. District of Columbia Bd. of Appeals & Review*, 826 A.2d 375, 379-80 (D.C. 2003) (internal quotation marks omitted; some alterations in *Walsh*). Similarly, this court "may not substitute its reasoning for [the agency's] when that reasoning appears to be lacking in [the agency's] order." *Gilmartin v. District of Columbia Bd. of Zoning Adjustment*, 579 A.2d 1164, 1171 n.6 (D.C. 1990). We therefore conclude that remand is necessary on the question whether the project should properly be characterized as a medium-density use or a moderate-density use.

**B.**

We also conclude that the Commission inadequately explained why the project would be consistent with UNE-2.6.1, the provision of the Upper Northeast Area Element stating that "[s]pecial care should be taken to protect the existing low-scale residential uses along and east of 10[th] Street NE . . . ." 10-A DCMR § 2416.3, UNE-2.6.1. In addressing that provision, the Commission said that the policy reflected in the provision must be balanced with other competing land-use policies; the provision does not flatly prohibit development in residential parts of the neighborhood or along 10th Street in particular; and the project includes features that "respect and protect the low-scale residential character" of 10th Street.

At first blush, it is difficult to see how approval of a project that requires the tearing down of five residences along 10th Street and the erection of a six-story building next to six other residences is consistent with taking special care to protect those residences. We recognize that a "conflict[] with one or more individual policies associated with the Comprehensive Plan . . . does not, in and of itself, preclude the Commission from concluding that [an] action would be consistent with the Comprehensive Plan as a whole." *Durant I*, 65 A.3d at 1168. *See also, e.g.*, *D.C. Library Renaissance Project/West End Library Advisory Gp. v. District*

*of Columbia Zoning Comm'n*, 73 A.3d 107, 126 (D.C. 2013) ("the Commission may balance competing priorities in order to evaluate whether a project would be inconsistent with the Plan as a whole"). We also recognize that, "[e]xcept where specifically provided, the Plan is not binding; it is only an interpretative tool [that] guide[s] but do[es] not direct the Commission's action." *Durant I*, 65 A.3d at 1168 (internal quotation marks omitted). Finally, we recognize that taking special care to protect something does not require protection at all costs, no matter how great. Nevertheless, we conclude that the Commission did not give adequate consideration to the policy favoring special care for the residences along 10th Street.

We assume that if showing special care for the residences along 10th Street would preclude the Commission from advancing the other policies relied upon by the Commission, then the Commission could resolve the conflict by deciding to advance other policies rather than to show special care for the residences along 10th Street. In other words, we assume that the policy favoring special care for the residences along 10th Street does not flatly bind the Commission. Even so, the Commission does not say that the only feasible way to advance other important policies would be to tear down five residences along 10th Street and build a six-story building next to six of the remaining residences. The Commission does say

that tearing down the residences would be "necessary in order to complete the Project," but that is quite different from concluding that the project -- or one like it that had a similar impact on the residences on 10th Street -- would be the only feasible way to advance the other policies the Commission relies upon as supporting approval of the project.  Put differently, the Commission has not explained why the various policies at issue conflict so as to require a trade-off among them.

*          *          *

In sum, we vacate the Commission's order and remand for the Commission (1) to address whether the project should properly be characterized as a moderate-density use or a medium-density use; (2) to address more fully the Upper Northeast Area Element policy that special care should be taken to protect the houses along 10th Street; (3) to determine whether, in light of the Commission's conclusions on these issues, the Commission should grant or deny approval of the project; and (4) to explain the Commission's reasoning in granting or denying approval.

*So ordered.*

NEWMAN, *Senior Judge*, concurring: I would vacate the order simply on the ground we explain in section II, that the Commission failed to exercise the independent judgment required of it in a contested case. We require the Zoning Commission itself, and not a party chosen by the Commission, to "make factual findings on each materially contested issue." *Durant I*, 65 A.3d at 1167 (quoting *Watergate E. Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning Comm'n*, 953 A.2d 1036, 1042 (D.C. 2008)). The Commission failed to do so here. However, since I cannot say, as a matter of law, that the 200-Footers are entitled to prevail on the merits, I join the court's disposition of remanding for further appropriate consideration.

As noted, this case has a history. When it was first before the Commission, the Commission adopted in substantially verbatim form the findings of fact and conclusions of law submitted by the developer. It was this order which we found deficient in *Durant I*.[1] Upon remand, the Commission, erroneously referring to the developer as the "prevailing party," entered a "procedural order" directing the developer to submit a "proposed order on remand that makes the <u>determinations,</u>

---

[1] In their first petition for review, the 200-Footers urged us to vacate that order because the Commission adopted the developer's proposed order substantially verbatim. We rejected that invitation in *Durant I*. 65 A.2d at 1163.

explanations, and findings of fact required by the Opinion" (emphasis added).[2]

This order also gave the 200-Footers and other interested entities a time period within which to "identif[y] any alleged errors or omissions in the findings of fact and conclusions of law stated in the proposed order." The 200-Footers did so. At a subsequent meeting of the Commission, it adopted the developer's submission in what appears to be 99.9% verbatim including almost all the grammatical and typographical errors contained therein. As the court's opinion further notes, the order "does not mention, much less address, any of the 200-Footers' objections to the developer's proposed order."[3]

The role of a factfinder, whether administrative or judicial, in a contested case is to neutrally find the facts, then apply the appropriate law and thus

---

[2] Implicit in a remand for further factfinding is the prospect that the facts as thereafter found may lead the decider to a different result. Declaring the developer the "prevailing party" may tend to indicate that the Commission summarily foreclosed that possibility before engaging in any deliberative process. Rather, the Commission seems to have thought it was only a scrivening problem. It was not.

[3] A skeptic might wonder whether there is any relationship between the Commission's failure to address the 200-Footers' objection to the proposed Order and the fact that the developer filed no reply to the 200-Footers' objections.

determine the outcome. It is not the proper function of such a factfinder to announce "you won, now tell me why."[4]

Both this court and other courts have condemned this practice.[5] In spite of this continued condemnation, courts have remained reluctant to vacate orders where the practice is clearly evident. In my view, it is high time for this court to begin to do so. I would do so here.[6]

---

[4] In the late 1970's, I attended a convention of the judges section of the American Bar Association in Atlanta, Georgia. There was a panel consisting of Judge Shirley Hufstedler, then of the U.S. Court of Appeals for the 9th Circuit, and her husband, Seth Hufstedler, a prominent trial lawyer and past president of the ABA. The topic was what a trial judge expects of a trial lawyer and what a trial lawyer expects of a trial judge. Mr. Hufstedler emphasized that a trial lawyer expects a trial judge to neutrally find the facts, correctly apply the law to the facts thus found, and thereby determine the outcome. He emphasized that it is not proper to determine the outcome and then find the facts to support that conclusion. This is as true today as the day he said it.

[5] *See, e.g.*, cases cited in the court's opinion, *supra* n.3.

[6] It would well behoove the Commission and benefit the city it and we serve to get it procedurally correct on the third try.