*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-AA-491

12/7/2017
FILED
District of Columbia
Court of Appeals
Julio Castillo
Clerk of Court

ST. MARY'S EPISCOPAL CHURCH, *et al.*, PETITIONERS,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

HILLEL AT THE GEORGE WASHINGTON UNIVERSITY, INTERVENOR.

On Petition for Review of an Order of the
District of Columbia Zoning Commission
(ZC06-11L)

(Argued June 14, 2017                    Decided December 7, 2017)

*David W. Brown* for petitioners.

*John Patrick Brown, Jr.*, with whom *Kate M. Olson* was on the brief for intervenor.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, *Loren L. AliKhan*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, were on the brief for respondent.

Before, BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN, *Associate Judge*, and REID, *Senior Judge*.

REID, *Senior Judge*: This case involves applications filed with District of

Columbia zoning authorities by Intervenor, Hillel at the George Washington

University ("Hillel"), and by George Washington University ("GWU"). The applications pertain to Hillel's plans to demolish its existing campus religious structure and to construct a new four-story edifice at 23rd and H Streets, in the Northwest quadrant of the District of Columbia; GWU plans to lease the top two floors. Petitioners, St. Mary's Episcopal Church ("St. Mary's")[1] and the West End Civic Association ("WECA"), opposed the applications. Petitioners seek review of the decision of the Zoning Commission of the District of Columbia ("the Commission") (a) approving Hillel's application for zoning relief, but requiring Hillel to follow the construction management plan reviewed by the Commission, and (b) granting GWU's application for an amendment to its 2007 Foggy Bottom Campus Plan, and requiring GWU to forgo development on another of its sites covered by the campus plan.

St. Mary's claims that the Commission's grant of lot occupancy and rear yard variances should be reversed. It mainly argues that (a) this court should give no deference to the Commission's findings of fact and conclusions of law because they "largely mirror" the proposed findings and conclusions of the petitioners, (b)

---

[1] African American Episcopalians established St. Mary's in the 1860s, and the church edifice was constructed in the 1880s.

Hillel failed to satisfy the exceptional or unique condition, and the practical difficulty requirements for obtaining variance relief, and (c) the variance relief granted to Hillel will result in a substantial detriment to the public good, namely (i) the risk that Hillel's demolition and construction will damage St. Mary's, (ii) the blocking of light and air to St. Mary's Rectory, and (iii) St. Mary's lack of access to H Street.

## FACTUAL SUMMARY

The record in this case, including the findings of fact made by the Zoning Commission, shows that Hillel began its quest to demolish its existing religious building and to construct a new facility at the GWU campus by filing its application for variance and special exception relief on March 27, 2014, before the District of Columbia Board of Zoning Adjustment. GWU filed its application for an amendment to its 2007 Campus Plan on April 22, 2014, before the Zoning Commission for the District of Columbia. The Commission consolidated the cases on May 12, 2014, and GWU and Hillel joined in an amendment to GWU's application to reflect the original applications of each entity. After the

Commission consolidated the cases, St. Mary's moved for party status on June 5, 2014.

The Hillel facility is located on a narrow, rectangular corner lot – 75 feet along H Street and 61 feet along 23rd Street. It has a total area of 4,575 square feet, which is much smaller than nearby religious facilities – for example, St. Mary's is 12,545 square feet – and it is much smaller than virtually all Jewish religious entities in the District – for example, the Jewish Community Center on 16th Street has 21,150 square feet. The corner lot does not have rear alley access, and it is located in a high height and medium-high density residential zone. The existing facility has a basement level with kitchens and a dining hall; the first floor has a meeting area, a congregating area, a lounge, and offices; and the second floor has an auditorium, and chapel space.

Hillel has unique institutional and religious needs. Rabbi Yoni Kaiser-Blueth testified, before the Commission, that "[t]he mission of Hillel is to provide for the needs of Jewish students at GW[U], including religious, social, and educational." Hillel conducts high holiday services for GWU students and alumni, as well as GWU community members; it "run[s] weekly classes and [provides]

weekly spiritual, emotional, and intellectual guidance . . . at a critical time in life." In addition, "Hillel . . . provides a place to practice important rituals and to celebrate Jewish heritage . . .[,] and a center for worship. . . ." At the time of the Commission's hearing on June 23, 2014, GWU had about 4,500 Jewish students, and the number of students involved in Hillel's activities had increased significantly, from 45 students a few years ago to almost 100 students, with a projected pool of 140 involved students. Hillel's mission had expanded to embrace UJew, a non-conventional Jewish organization, and Gather the Jews, "a young adult network that has emerged as the pre-eminent resource for young adults seeking connections and information on Jewish religious, social, and educational opportunities in the [District of Columbia] area."

To meet its current institutional and religious needs, Hillel's new facility must have a sanctuary, with a vestibule, that is large enough to accommodate worship services; a dining space large enough for regular religious services as well as holiday meals; two kitchens to allow kosher food preparation and kosher services; a rooftop that can hold a sukkah (a booth-like structure, or a hut) for the celebration of Sukkot, a festival commemorating the period in which the children of Israel wandered in the desert and lived in temporary shelters; space for student

counseling, ministry, and education; and informal gathering space for socialization. As envisioned, the new facility will contain a basement, second floor, and two leased floors. The lower level of the new facility will contain a sanctuary, dining hall, and two kosher kitchens – separating meat and dairy. The second floor will be dedicated to staff offices, a student lounge, gathering space, a study area, and a library. The third and fourth floors will be leased to GWU.

To establish the need for area variance relief and special exception relief for the new facility, Hillel presented the testimony of its expert Elba Morales, an architect and a senior associate with Hickok Cole Architects; Ms. Morales has a masters' degree from the University of Pennsylvania and specializes in project design. She presented the design of the new facility, addressed how Hillel had met the test for variance relief, and discussed the exceptional conditions of the property that led to practical difficulties in complying with the District's regulatory requirements. She emphasized the small site and the fact that "the court and the corridor that serves it occupies 43% of the lot size"; consequently, without a floor area ratio (FAR) variance, some of the planned spaces on the floors of the new facility would have to be reduced and would not meet Hillel's needs. The practical

difficulty is that some things – such as the sanctuary or the dining hall – cannot be split between two floors.

The Office of Planning ("OP"), through its Deputy Director, Jennifer Steingasser, submitted a written statement assessing Hillel's application for variance and special exception relief. OP first summarized why zoning relief was required: (a) "[t]he proposed FAR of 3.75 [would] exceed[] the 3.5 FAR limit by approximately 1,150 square feet," (b) the new facility "would occupy 100% of the lot and have no rear yard," (c) "[n]o parking or loading would be provided," and (d) there would be "a non-conforming rooftop structure."

OP analyzed Hillel's request for variance relief, determining that the uniqueness of Hillel's property lies in its corner location and the smallness of its size compared to that of nearby religious institutions, and Jewish institution sites in other parts of the District. Moreover, Hillel has "unique needs"; specifically including: (1) a facility on or near GWU in order to carry out its mission to GWU's Jewish students; (2) the replacement of a 1980s building that can no longer serve as a base for Hillel's religious and institutional mission; (3) a facility that "must accommodate unique programmatic needs, including a sanctuary and

accessory space to accommodate at least 140 students for worship, a basement dining area, kosher kitchens, space for student meetings, counseling, educational programming, and offices; and (4) space for "future program expansion."

OP found that the uniqueness or exceptional conditions resulted in "practical difficulties" in meeting certain regulatory requirements. One practical difficulty relates to both § 403.2 of the Zoning Regulations of 1958, as amended, which specifies that the maximum percentage lot occupancy of Hillel's facility is 75% of the lot, and § 404.1 of the regulations, which states that the rear yard must have a minimum depth of 20 feet. The practical difficulty with meeting the percentage of lot occupancy regulation is that "Hillel's religious and programmatic needs . . . require sizeable floor plates to accommodate assembly and food service," and these "functions . . . require a larger building core." In Hillel's case its "building core space incorporates (1) multiple stairways and larger corridors which are required for an assembly use, (2) wider stairways and a second elevator for assembly use and occupant load proposed for the roof, (3) heightened plumbing requirements for assembly use, and (4) exhaust shafts and service elevator for the kitchen use." As Ms. Morales testified, the court and corridor will occupy 43% of Hillel's lot size. OP concluded that "[e]ven with lot occupancy and rear yard

variances, the building core reduces the useable square footage to about 2,500 square feet on the ground floor and about 2,300 square feet on the upper floors." This reduction would have a negative impact on "the already constrained useable floor area and likely fragment Hillel programming (such as the assembly use) to multiple floors."

Another practical difficulty pertaining to Hillel's proposed facility is compliance with § 402.4 of the Zoning Regulations, which sets the maximum FAR for the facility at 3.5. As proposed, the Hillel facility would have a 3.75 FAR. OP determined that if Hillel had to comply with the maximum FAR, it would result in the reduction of 1,150 square feet and "would create a practical difficulty" because it would have limited expansion space, would reduce revenue from GWU through the lease of the top two floors, and "would impact Hillel's intended use of the roof space for outdoor religious space and programming." Furthermore, alternative designs reducing floor area on each floor "would impact the functionality of the worship space and create less efficient layouts."

Paul Goldstein of OP testified at the Commission's hearing that OP recommended approval of zoning relief subject to certain conditions, including a

construction management agreement between St. Mary's and Hillel. Mr. Goldstein asserted that "the applicant has satisfied the variance test for the floor area ratio (FAR), lot occupancy, rear yard, and parking, and also has satisfied the special exception test for the roof structures."[2]

St. Mary's presented its case through its witnesses and through legal argument by its attorney. Windon Ringer, Senior Warden of St. Mary's, recounted the history of the church – its formation by a group of African American Episcopalians in 1867, the design of the church by a renowned architect of that time period (James Renwick), the architectural significance of the church whose construction was completed in 1887 – and the fact that St. Mary's is on the National Register of Historic Places. He expressed concern about the lot

---

[2] OP also supported the requested campus plan amendment. The District's Department of Transportation submitted its analysis, focusing on parking, loading, and trash. DDOT generally supported Hillel's project. In her testimony, Suzi Cora, Director of Campus Planning for GWU's Division of Operations, declared that "to offset the additional density of the proposed GW[U] leased space," GWU would not develop an approved site under the campus plan, Site 77D (about 9,504 square feet) at 21st and I Streets. Patrick Kennedy, Chairperson of ANC 2A testified that "the interests of Hillel must be balanced with those of the surrounding neighborhood – and particularly those of St. Mary's Episcopal Church – the abutting property owner to the south." ANC 2A agreed with OP and generally approved Hillel's project but urged that Hillel and St. Mary's continue to work on a construction management plan to protect the integrity of St. Mary's.

occupancy and rear yard variances. Dr. Richard English, a member of St. Mary's, a Eucharistic Minister, a former Provost and Chief Academic Officer of Howard University, and a retired professor, detailed the past damage to St. Mary's during GWU's construction of its Health and Wellness Center – religious icons fell and were destroyed; the archway between the nave, congregation and altar fell; cracks developed in the walls and floor; the church was condemned and could not be occupied for a three-year period. Dr. English wanted assurance that St. Mary's would not suffer damage due to the demolition of Hillel's existing facility and the construction of the new facility. St. Mary's structural engineer, John Matteo also described the damage to St. Mary's during the construction of GWU's Health and Wellness Center, especially the settlement, lateral movement, and cracking of St. Mary's caused by the construction. He agreed that the best way to handle the proposed demolition and construction of the Hillel facility is to have "a very good and strong construction management agreement."[3]

---

[3] Barbara Kahlow, who lived about two blocks from the Hillel property, testified on behalf of the West End Citizens Association. WECA expressed concern about the potential damage to St. Mary's; the impact of variances, especially the 100% lot occupancy variance, on neighboring properties; and the impact of Hillel's loading in a residential area, where trucks would block the street.

On November 23, 2015, after reviewing post-hearing submissions from the parties, the Commission issued a comprehensive decision containing 76 findings of fact and conclusions of law. The findings covered variance relief (exceptional conditions of Hillel's property, the practical difficulties regarding the lot occupancy, rear yard, and FAR requirements, as well as the detriment to public good standard); special exception relief relating to the setback for the penthouse (roof) structures; and the campus plan amendments. The Commission also set forth conclusions of law concerning these areas, as well as others. The Commission approved Hillel's proposed project and the use of the third and fourth floors "for student life and academic uses only." The Commission also ruled that GWU must (1) forgo development on Site 77D; (2) abide by the provisions of the construction management plan that is part of the record;[4] and (3) use trash bins rather than carts, unless DDOT approves carts through its public space process.

---

[4] In the Construction Management Plan, Hillel acknowledges the historic landmark status of St. Mary's. The Plan details procedures for Hillel, including communications with St. Mary's during construction; pre-construction review; reimbursement of specified expenses incurred by St. Mary's; surveys, assessments, and monitoring; construction practices and site management; schedule; cleanliness and dust; and insurance. The insurance provision requires Hillel to ensure that its general contractor has a commercial liability policy for the benefit of St. Mary's, in the amount of $25,000,000.00.

The Commission's decision became final on May 6, 2016, and St. Mary's and WECA filed a petition for review with this court on May 19, 2016.

**STANDARD OF REVIEW**

"Generally, [w]hen reviewing an order of the Commission . . . [we] give great deference to the . . . findings supporting the decision." *Durant v. District of Columbia Zoning Comm'n*, 99 A.3d 253, 257 (D.C. 2014) (*Durant II*) (internal quotation marks and citation omitted). "It is not this court's role to determine whether a particular zoning action is, or is not, desirable." *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1167 (D.C. 2013) (*Durant I*) (internal quotation marks and citation omitted). "[W]e must affirm the Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings." *Id*. "If there is substantial evidence to support the [Commission's] finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the [Commission]." *Watergate East Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning*

*Comm'n*, 953 A.2d 1036, 1043 (D.C. 2008) (internal quotation marks and citation omitted). "An agency's interpretation of the regulations that govern it must be accorded great weight, and must be upheld unless it is plainly erroneous or inconsistent with the regulations." *Metropole Condo. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 141 A.3d 1079, 1082 (D.C. 2016) (internal quotation marks and citation omitted). We do not "prohibit the practice of verbatim adoption of orders proposed by one of the parties," *Durant II*, *supra*, 99 A.3d at 257 (citation omitted), but such verbatim adoption "will trigger more careful appellate scrutiny and result in less deference to the ruling of the . . . administrative agency," *Metropole*, *supra*, 141 A.3d at 1082 (internal quotation marks and citation omitted).

## ANALYSIS

### Verbatim Adoption of the Prevailing Party's Proposed Order

St. Mary's and WECA first contend that the usual standard of review in this case must be substituted by a more searching appellate inquiry because the Commission's findings and conclusions largely mirror the proposed findings

submitted by Hillel, and the Commission's Order "hardly mentions, much less addresses, Petitioner's objections" to Hillel's proposed findings. Both Hillel and the Zoning Commission argue that the Commission's Order does not reflect a verbatim adoption of applicants' proposed findings and conclusions, and that the Order evidences the Commission's independent judgment. Our review of the Commission's Order and the parties' proposed findings and conclusions convinces us that although the Commission adopted a substantial number of Hillel's proposed findings and conclusions, it exercised its independent judgment and addressed key arguments made by St. Mary's and WECA.

St. Mary's challenged Hillel's institutional need for a new facility, and hence, its need for variance relief. In reaching its conclusion regarding practical difficulty and institutional need, the Commission included the following language in its Order that is not part of Hillel's proposed findings and conclusions and that clearly addresses a key argument made by St. Mary's: "[T]he Commission was not persuaded by the Church's argument that because two floors will be leased to the University, Hillel does not have an institutional need for the new facility. Hillel has shown that the need for the requested relief flows for a building with

floor plates that are large enough to accommodate the institutional needs described above while still meeting code requirements."

St. Mary's complained about the reduction of light and air to its property that would result from Hillel's construction of a new facility. The Commission included the following response that is not part of Hillel's proposed conclusions: "The reduction of light and air suffered by the Church as a result of the construction of this project is actually less than could occur if a building that complied with matter of right zoning limits was built on the site." The Commission addressed yet another key concern brought forth by St. Mary's – that relating to the rear yard or lot occupancy variance. In language that is not part of Hillel's proposed conclusion on the public good standard, the Commission asserted that St. Mary's "misconstrues the variance standard" and the Commission not only explained why but also added that "the minor zoning relief granted under this Order would not cause greater impacts to the Church than proceeding under a matter of right design."

The Commission also revealed its independent judgment when it included extensive language that is not part of Hillel's proposed conclusions relating to the

concerns of ANC 2A, and OP's concerns and recommendations. Our examination of the Commission's Order in this case shows that it is quite different from *Durant II*, *supra*, where the Commission's Order consisted of "approximately 99.9% verbatim adoption of the developer's proposed order" and "did not mention, much less address, any of the [opposing parties'] objections to the developer's proposed order." *Id*. at 257. Similarly, the Commission's Order here is distinguishable from that in *Metropole Condo. Ass'n*, *supra*, where this court applied a stricter standard of review because the order there "largely mirror[ed] the applicant's proposed findings and conclusions with only a few minor typographical changes." *Id*. at 1082. In sum, what we said in *Watergate East Comm. Against Hotel Conversion to Co-Op Apartments*, *supra*, equally applies in this case: "The Commission did not accept uncritically the findings [and conclusions] tendered by the applicant. Although the majority of paragraphs were adopted verbatim from the applicant's proposals, the Commission added sentences and phrases, changed sentence structure, referenced the applicable regulations, changed the grammar, and, in some places, added entirely new paragraphs. Under these circumstances, we see no reason to doubt that the Commission's findings and decision represent its own considered conclusions." *Id*. at 1045. Therefore, our review of the Commission's Order in this case is deferential.

**Lot Occupancy and Rear Yard Variances**

Second, St. Mary's and WECA argue that the Commission incorrectly concluded that Hillel met this court's three-prong test for an area variance. We review this argument in the context of the statutory powers granted to the Commission. The Commission has broad powers over zoning in the District of Columbia. D.C. Code § 6-621.01 (e) (2012 Repl.) provides that

> [t]he Zoning Commission shall exercise all the powers and perform all the duties with respect to zoning in the District as provided by law. This includes the power [w]here, by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of the original adoption of the regulations or by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation adopted under this subchapter would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, to authorize, upon an appeal relating to such property, a variance from such strict application so as to relieve such difficulties or hardship, provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map. D.C. Code § 6-641.07 (g)(3).

This court has adopted a three-prong test for the exercise of the power granted under D.C. Code § 6-641.07 (g)(3); the District's zoning authorities are authorized to grant an area variance if they find that "(1) there is an extraordinary or exceptional condition affecting the property; (2) practical difficulties will occur if the zoning regulations are strictly enforced; and (3) the requested relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan." *Ait-Ghezala v. District of Columbia Bd. of Zoning Adjustment*, 148 A.3d 1211, 1216 (D.C. 2016) (citing *Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 1000 (D.C. 2005)) (internal quotation marks omitted). With respect to the first prong we have said that "it is fundamental that the difficulties or hardships [be] due to unique circumstances peculiar to the applicant's property and not to the general conditions in the neighborhood." *Gilmartin v. District of Columbia Bd. of Zoning Adjustment*, 579 A.2d 1164, 1168 (D.C. 1990) (quoting *Palmer v. Board of Zoning Adjustment*, 287 A.2d 535, 539 (D.C. 1972)). "The statute does not preclude the approval of a variance where the uniqueness arises from a confluence of factors." *Id.*

Here, the Commission concluded that Hillel "is affected by an exceptional condition arising from a confluence of factors," including (1) the size, shape, and configuration of its lot – the lot is smaller in size than that of neighboring religious institutions, and synagogues in the District of Columbia; and (2) its demonstrated need to improve and expand its facility and maintain its location near the GWU campus where it can best serve its primary constituency – students. It further found that Hillel "is an organization with unique institutional and religious needs that are not related to general conditions in the neighborhood" but "uniquely tied to" GWU and its 4,500 Jewish students; and the existing facility cannot "accommodate existing demand for certain events" and anticipated future growth. Due to limited space, Hillel has not been able to accommodate those desiring access to the existing facility "not only for holidays but also for regular Friday Shabbat services and dinner." These findings are based on substantial evidence, as shown in the factual summary of this opinion. The findings also are supported by our case law. *See Ait-Ghezala*, *supra*, 148 A.3d at 1217 (property's "irregular shape" and "narrow width" constituted "part of a confluence of features that justify the grant of an area variance"); *Fleischman v. District of Columbia Bd. of Zoning Adjustment*, 27 A.3d 554, 561 (D.C. 2011) (uniqueness found due to "site's irregular shape" and "physical configuration"); *Monaco v. District of Columbia*

*Bd. of Zoning Adjustment*, 407 A.2d 1091, 1097 (D.C. 1979) (need to expand an existing building may be an exceptional condition; the Commission "may be more flexible when it assesses a non-profit organization"); *Draude v. District of Columbia Bd. of Zoning Adjustment* (*Draude II*), 582 A.2d 949, 955 (D.C. 1990) ("institutional necessity for GWU to expand its ambulatory health care facilities … [to] be physically linked and interconnected with" an adjacent building consisting of GWU faculty offices).

St. Mary's strongly disagrees with the Commission's findings and conclusions regarding the applicability of *Monaco* and *Draude II*, and the exceptional condition of Hillel's property and institutional necessity. St. Mary's argues that "Hillel has demonstrated only that it would prefer, for less than compelling reasons, to raze the [existing Hillel facility], built in compliance with [zone] R-5-D development standards, that has served Hillel's intended purposes for 30 years," and that Hillel essentially "preferred the new, non-compliant building with GW[U] lease space as 'more cost-effective and beneficial.'" The Commission clearly considered St. Mary's arguments and what this court said in *Fleischman*, *supra*, is equally true here, "[t]he mere fact that petitioners presented contrary evidence . . . is immaterial[;] [a]s the trier of fact, the [Commission] may

credit the evidence upon which it relies to the detriment of conflicting evidence, and need not explain why it favored the evidence on one side over that on the other." *Id*. at 562 (citation omitted). In light of substantial record evidence showing (1) Hillel considered the feasibility of renovating the existing building, (2) testimony from Rabbi Kaiser-Blueth and GWU students emphasizing the uninviting and fortress-like condition of the existing building, (3) increasing numbers of students and others seeking to participate in Hillel's activities and services, (4) the exceptional configuration of the lot, and (5) Hillel's institutional mission and needs; and given the Commission's correct reading and application of our case law, including *Monaco*, *supra*, which clearly stated that the Commission "may be more flexible when it assesses a non-profit organization," *id*. at 1098, we see no reason to disturb the Commission's findings and conclusions regarding the first prong of the test for granting an area variance – "there is an extraordinary or exceptional condition affecting the property." *Ait-Ghezala*, *supra*, 148 A.3d at 1216.

With respect to the second prong of the test for granting an area variance, the Commission concluded that Hillel would face "practical difficulties" if the zoning regulations were strictly enforced. St. Mary's claims it contested Hillel's

arguments concerning its religious and programmatic needs "in almost every respect" and the Commission's findings are "legally deficient for [its] failure to address a materially contested issue and [to] explain its conclusion." Hence, the Commission's conclusions of law "should be rejected and the variances reversed." We review the practical difficulties prong on a case-by-case basis "under a rule of deference to administrative expertise." *Fleischman*, *supra*, 27 A.3d at 561. To satisfy its burden on the second prong of the variance test, Hillel "must show (1) that the specific design it wants to build constitutes an institutional necessity, not merely the most desired of various options, and (2) precisely how the needed design features require the specific variance sought," here the lot occupancy and rear yard variances. *Draude v. District of Columbia Bd. of Zoning Adjustment*, 527 A.2d 1242, 1256 (D.C. 1987) (*Draude I*). The Commission "may . . . consider a wide range of factors in determining whether there is an 'unnecessary burden' or 'practical difficulty.'" *Gilmartin*, *supra*, 579 A.2d at 1171. These factors include "[i]ncreased expense and inconvenience to applicants for a variance," and "the severity of the variance(s) requested." *Id.* Based on substantial record evidence recounted earlier in this opinion, we conclude that the Commission properly concluded that if it strictly applied the lot occupancy and rear yard requirements, it "would result in an inefficient and uneconomical building" that "would not yield

enough useable space for the worship, dining, and program space required by Hillel."

St. Mary's argues that the height of the new building and the related need for a rear yard variance is due to GWU's twenty-year lease of the top two floors, and that this lease arrangement does not constitute institutional necessity. However, the Commission found that Hillel could not secure financing for its project without the GWU lease, and that even without the top two floors, the building's footprint would have to remain the same due to building code requirements and institutional needs. This finding is supported by substantial evidence, presented by Hillel's witnesses, showing that Hillel's religious and programmatic needs require a large worship space, two kosher kitchens, dining spaces, a vestibule to provide transition from the street to the sanctuary, a roof large enough to accommodate a sukkah, and other program and student spaces. In addition, code requirements call for "multiple stairways, corridors, and plumbing uses," as well as exhaust shafts and multiple elevators. These requirements, along with Hillel's narrow corner lot, reduce the available floor space on each level. In sum, there is substantial evidence in the record to satisfy the second prong of the area variance test and to support the Commission's conclusion that "Hillel . . . satisfactorily proved that the

specific design [of its new facility] is driven by the institutional need for a single contiguous worship space and dining space of a certain size, and that such spaces could not be constructed in a facility that complies with the requirements of the Zoning Regulations."

Under the third prong of the variance test, the burden was on St. Mary's to "convincingly show that [Hillel's new facility] will be detrimental to the public good," *Draude II*, *supra*, 582 A.2d at 957, that is that "variance relief will . . . create a substantial detriment to the public good." *Draude I*, *supra*, 527 A.2d at 1254. Thus, the Commission was correct in its statement that St. Mary's misconstrued the variance standard; it is not whether harm will result from the construction of the facility, but whether harm will result from the structure as built with the variance. We "defer to the [Commission's] interpretation of its own regulations so long as its interpretation is consistent with the regulations and not plainly erroneous." *Gilmartin*, *supra*, 579 A.2d at 1167 (internal quotation marks and citation omitted). We conclude that the Commission's interpretation of its variance standard is not plainly erroneous or inconsistent with the plain words of its regulations.

Here, St. Mary's structural engineer, John Matteo, did not testify that Hillel's new facility (with the area variances) would damage St. Mary's. Rather, his focus was on the past damage to St. Mary's during GWU's construction of its Health and Wellness Center. He agreed that the best way to monitor the Hillel's demolition and construction to prevent future damage would be through "a very good and strong construction management agreement"; the construction management plan which the Commission has required Hillel to follow has strong monitoring and surveying provisions, as well as mandates that Hillel's contractor have a commercial liability policy in the amount of $25,000,000.00. However, Mr. Matteo did not offer an opinion that as constructed with the variance the new facility would cause damage to St. Mary's.

Furthermore, we see no need to disturb the Commission's findings and conclusions regarding St. Mary's access to sunlight and air, and access across Hillel's rear yard. Hillel provided shadow studies demonstrating that the new facility would not cast additional shadows on St. Mary's, and the Commission concluded that (1) the new facility's impact on light and air was less significant than what Hillel was entitled to as a matter of right, and (2) Hillel's revised facility design further reduced the impact on light and air by moving the rooftop penthouse

away from St. Mary's (with a four-foot setback where none was required) and toward another GWU building, Amsterdam Hall. With regard to access across Hillel's rear yard, the Commission determined that the zoning regulations "do not require that Hillel provide [St. Mary's] with a right of access across [its] Property, nor do they grant the Commission . . . the right to review and enforce any alleged easement rights." Nevertheless, rather than ignore St. Mary's argument concerning the loss of access across Hillel's rear yard, the Commission stated that St. Mary's concern was adequately addressed "through the provision of an easement memorializing [its] right of access across [GWU's] Amsterdam Hall property." In short, we see no reason to disturb the Commission's findings and conclusions that the requested variance relief can be granted without substantial impact to the public good.

Accordingly, for the foregoing reasons, we affirm the Order of the Zoning Commission.

*So ordered.*