*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-AA-0929

DEBORAH A. HERNANDEZ, *et al.*, PETITIONERS,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, RESPONDENT,

and

NEZAHAT HARRISON, *et al.*, INTERVENORS.

On Petition for Review from a Decision and Order of the
District of Columbia Board of Zoning Adjustment
(2023-BZA-20594)

(Submitted September 26, 2024                    Decided March 12, 2026)

*David W. Brown* was on the brief for petitioners.

*Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, and *Ashwin P. Phatak*, Principal Deputy Solicitor General, filed a Statement in Lieu of Brief for respondent.

*Paul E. Harrison* was on the brief for intervenors.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and DEAHL and HOWARD, *Associate Judges*.

HOWARD, *Associate Judge*: Consistent with the Zoning Regulations, the District of Columbia Board of Zoning Adjustment (BZA) has the discretion to grant a theoretical subdivision as a special exception to certain development standards for residential zones. This exception allows successful applicants to build multiple principal buildings on a single record lot. The BZA may grant this exception if applicants satisfy their burden of proof. To do so, applicants must show that the exception will be consistent with the "purpose and intent of the Zoning Regulations and . . . Maps," and that the exception "will not . . . affect adversely, the use of neighboring property." 11 D.C.M.R. Subtitle X § 901.2. Once satisfied, the BZA may waive any enumerated requirements under Subtitle C § 302.1 to permit the construction of multiple buildings on one lot.

Intervenors, Nezahat and Paul Harrison, applied to the BZA for a theoretical subdivision as a special exception to build two principal homes on their residential property. The Harrisons alternatively applied for a variance from the minimum lot width requirements. The BZA granted the special exception and waived the minimum lot width requirement but denied the variance. Petitioners, Deborah Hernandez and Mary Lee, appeal this decision, asserting that the BZA could not grant a special exception and waive the lot width requirement while it simultaneously denied the lot width variance.

We disagree with Petitioners and affirm the BZA's grant of the theoretical subdivision as a special exception.

## I.   Background

At the heart of this petition for review is an application to build two principal homes on a single piece of residential property. Due to the dimensions of the proposed project, an exception would need to be made to the minimum lot width requirements to allow the applicants to proceed with construction.

The property in dispute is owned by applicants-intervenors, Nezahat and Paul Harrison (the Harrisons), and is located within the Forest Hills neighborhood. The property, a "through lot," is rectangular in shape and is located at 3007 Albemarle Street, NW. The total area of the lot is 30,618 square feet. The property also contains a pipestem[1] driveway that extends south to Albemarle Street. The pipestem grants vehicle and pedestrian access to the property. The two neighboring lots, located at 3005 Albemarle Street NW and 3009 Albemarle Street NW, are owned

---

[1] A pipestem, as the term is used here, is a narrow strip of land used to connect residences to the street, akin to a driveway. *See Definition of Pipestem Lot*, WIKTIONARY, https://en.wiktionary.org/wiki/pipestem; https://perma.cc/BZ8G-7FE2 (last visited Mar. 10, 2026).

by petitioners Deborah Hernandez and Mary Lee who have a "right-of-way easement" over the pipestem for "pedestrian and vehicle access."

Under D.C.'s Zoning Regulations, the Forest Hills neighborhood is a specially designated Residential House (R) zone. *See* 11 D.C.M.R. Subtitle D § 500 (2016).[2] R zones are designed to provide stable, low to moderate-density residential areas suitable for family life and supporting uses. 11 D.C.M.R. Subtitle D § 100.1 (2016). The development standards for R zones are enumerated in Subtitle D, Chapters 1 and 2 of the D.C. Municipal Regulations (2016). Those standards regulate "the bulk or volume of structures," including their height, floor area ratio, lot occupancy, yards, and their relation to adjacent lots and streets. *Id.* § 101.2(a)-(d) (2016). Specially designated geographically modified zones, such as the Forest Hills neighborhood, are subject to R zone development standards but typically with a few modifications. Zoning for the Forest Hills neighborhood differs from regular R zone

---

[2] The Zoning Commission amended D.C.'s zoning regulations to change the zone names and reorganize the structure of Subtitles D, E, and F on July 27, 2023, effective August 25, 2023. *See* Zoning Commission Order No. 18-16/19-27-19-72B published at 70 D.C. Reg. 11297 (Aug. 25, 2023). Though the amendment was effective at the time the BZA's Decision and Order was issued, the BZA referred to the 2016 version of the zoning regulations in its order to reflect the zoning provisions in effect when the Board held public hearings and previously voted and considered the Harrisons's application. We note that the 2023 amendment did not make any substantive changes to the applicable zoning regulations that would have affected the outcome of the Harrisons's application. We will refer to the 2016 provisions of Subtitle D to remain consistent with the BZA and the application at issue.

development standards to "[p]reserve and enhance [its] park-like setting," "[p]reserve the natural topography," "[p]revent significant adverse impact on adjacent open space, parkland, stream beds, or other environmentally sensitive natural areas," and "[l]imit permitted ground coverage of new and expanded buildings and other construction" to encourage general compatibility with the existing neighborhood. *Id.* § 500.1(a)-(d) (2016).

In addition to specific zoning regulations, all zones, including R zones and their special designations, are subject to the general rules of Subtitle C of the D.C.M.R. Subtitle C includes Chapter regulations pertaining to tree protection, green area ratio, parking requirements, and, as is relevant to this case, subdivisions within a zone. Chapter 3, entitled Subdivision, provides "[g]eneral rules for the creation of new record lots," "[g]uidance regarding how to determine the applicability of lot dimension and shape regulations to a zone," "[g]eneral rules for measurement and standards that relate to the dimension and shape of lots," and "controls on the number of buildings on a record lot." *Id.* § 300.1(a)-(d). These regulations are "intended to ensure the dimensions and shapes of lots created are consistent with the purposes of a zone." *Id.* § 300.2. Pursuant to Section 302.2, only one primary building shall be erected per record lot. Nevertheless, the Chapter also gives the BZA discretion to grant theoretical subdivisions as a special exception "to

allow multiple primary buildings on a single record lot," provided certain standards are met. *Id.* § 305.1.

The Harrisons applied for a special exception pursuant to Subtitle C § 305 "to allow two new detached principal dwellings on one record lot in a theoretical subdivision." *See id.* § 305. Alternatively, the Harrisons sought "an area variance from the lot width requirements of Subtitle D § 502 to allow two new detached principal dwellings in a subdivision to create two record lots at the subject property."[3] In brief, the Harrisons sought to build two homes on their property either through a theoretical subdivision or through a record lot subdivision. Either would require that an exception be made to Forest Hills' minimum lot width requirements. So, the Harrisons applied for a theoretical subdivision as a special exception to waive the minimum lot width requirement, or, in the event that their application for the special exception was denied, a variance from the same minimum lot width requirement.

---

[3] Initially, the Harrisons sought two area variances, the first from the minimum lot width requirement and the second from "[t]he lot frontage requirements of Subtitle C, Section 303.2." After the initial application was filed, the Harrisons elected to apply instead for a theoretical subdivision as a special exception, or, in the alternative, an area variance from the minimum lot width requirements, and filed the revised application that is now the subject of this appeal.

Petitioners Hernandez and Lee opposed the Harrisons's application and requested that the BZA grant them party-opponent status in December 2021, about three months after the Harrison's filed their initial application. Ms. Hernandez opposed the application citing a number of concerns. Ms. Hernandez was concerned that the Harrisons's project would diminish property value, adversely affect stormwater drainage, have an adverse social impact due to (presumably decreased) privacy from the two new buildings, and because she believed the project was "inconsistent with the intent, purpose and integrity of the zoning regulations." Ms. Hernandez warned that approval of the Harrisons's application would "set a[n] undesirable precedent" for the neighborhood. Ms. Lee expressed similar concerns; specifically, that the project would devalue her own property value due to the Harrisons's larger proposed homes, and feared that the homes' placement would create more complex stormwater runoff problems.

In a report from the D.C. Office of Planning (OP) to evaluate the Harrisons's application for the BZA, OP "recommended approval of the special exception . . . and denial of the requested variance." The report found that the project "should not significantly negatively impact neighboring properties" or "have an adverse effect on the character and future development of the neighborhood." A

separate report from the ANC 3F[4] Commissioners to the BZA unanimously recommended the BZA approve the Harrisons's application. Although the ANC 3F did not specifically recommend the BZA approve the Harrisons's request for a special exception, they recommended approval of the variance, finding that their "significant investment in addressing long-standing storm and groundwater problems . . . are likely to improve the water management conditions at and around the Property."

The BZA held three public hearings and several public meetings regarding the Harrisons's application. The BZA determined that the Harrisons satisfied their burden of proof to qualify for a theoretical subdivision as a special exception, "but failed to satisfy the burden of proof for a variance from the lot dimension requirements of Subtitle D § 502, to allow two new detached principal dwellings." With this determination, the Harrisons would be able to move forward with their plan to construct two new primary homes on their property under the special exception. Petitioners timely petitioned for review of the BZA's grant of a special exception under Subtitle C § 305.

---

[4] The Advisory Neighborhood Commission for the Third Ward which covers the subject property.

## II. Standard of Review

Petitioners seek review of the BZA's grant of the theoretical subdivision as a special exception to waive the minimum lot width requirement. We generally review decisions of the BZA, in the same manner that we review administrative adjudications. *McDonald v. D.C. Bd. of Zoning Adjustment*, 291 A.3d 1109, 1115 (D.C. 2023). Petitioners assert that their challenge is solely a legal question regarding interpretation of the regulations by the BZA, thereby abandoning all other challenges based upon evidence in the record. Petitioners also concede that deference is owed to the BZA's interpretation of its regulations.[5] We therefore proceed as we have previously, noting that "[w]hile we accord deference to a reasonable agency interpretation of its regulation, ultimately, we review the legal conclusions of the agency de novo." *Friends of the Field v. D.C. Bd. of Zoning Adjustment*, 321 A.3d 673, 680 (D.C. 2024) (quoting *Comm. Of Neighbors Directly*

---

[5] Specifically, Petitioners assert that "[a]n agency's interpretation of the regulations that govern it must be accorded great weight, and must be upheld unless it is plainly erroneous or inconsistent with the regulations. At the same time, where the agency's final decision rests on a question of law, the reviewing court has the greater expertise, and the agency decision is therefore accorded less deference." *Fleischman v. D.C. Bd. Of Zoning Adjustment*, 27 A.3d 554, 557 (D.C. 2011) (quoting *Economides v. D.C. Bd. Of Zoning Adjustment*, 954 A.2d 427, 433 (D.C. 2008)).

*Impacted by LAMB Application v. D.C. Bd. of Zoning Adjustment*, 218 A.3d 739, 742 (D.C. 2019)).[6]

### III.  Discussion

Petitioners argue that the BZA unreasonably interpreted the Zoning Regulations by granting a theoretical subdivision as a special exception to the applicable minimum lot width requirements while simultaneously denying an area variance for the same lot width requirements.  According to Petitioners, the BZA should have denied the Harrisons's application for a special exception for the same reasons it denied the lot width variance.

Specifically, Petitioners assert that the applicable Zoning Regulations do not allow the BZA to waive lot width requirements through a theoretical subdivision as a special exception.  Instead, they argue that lot width requirements should only be waived by the granting of a variance in conjunction with the special exception.  Petitioners claim it is contradictory for the BZA to grant a theoretical subdivision as

---

[6] We note in the same vein as we have previously that "we reserve judgment on any potential impact of *Loper Bright Enter[s.] v. Raimondo*, [603 U.S. 369 (2024),]" and the Review of Agency Clarification Amendment Act of 2025 "on our well-established deference to an agency's interpretation of a relevant statute and regulations" to an appropriate case raising those issues.  *Friends of the Field*, 321 A.3d at 680 n.2 (quoting *Vornado 3040 M St., LLC v. District of Columbia*, 318 A.3d 1185, 1195 n.7 (D.C. 2024)).

a special exception to waive lot width requirements but also deny a separately requested width variance. In support of their argument, Petitioners discuss the zoning regulatory scheme at length and point to prior BZA decisions to distinguish the BZA's reasoning here.

We disagree with Petitioners' interpretation of the Zoning Regulations and address Petitioners' arguments below. We begin by exploring the BZA's authority to grant special exceptions under Subtitle X and theoretical subdivisions under Subtitle C of the Zoning Regulations. We then discuss the distinction between variances and theoretical subdivisions as special exceptions and the different standards required for either exception to be granted. We hold that the Zoning Regulations allow the BZA to grant a theoretical subdivision as a special exception and thereby waive minimum lot width requirements without the need for it to simultaneously grant a variance from the same lot width requirements. As Petitioners do not raise any other challenge to the decision of the BZA, we need not review the record for substantial evidence to support the BZA's findings.

### A.     The Zoning Regulations Give the BZA Authority to Grant Theoretical Subdivisions as Special Exceptions

Zoning Regulations allow the BZA to grant special exceptions upon a determination that an applicant meets the requirements, which we will describe in more detail shortly. *Stewart v. D.C. Bd. of Zoning Adjustment*, 305 A.2d 516, 518

(D.C. 1973). "Special exceptions . . . are expressly provided for in the Zoning Regulations." *Id.* Once an applicant establishes that they have met all the requirements, "the [BZA] ordinarily must grant [the] application." *Id.* Whether an applicant has met the requirements for a special exception is an analysis conducted independently from the analysis to determine if an applicant qualifies for a variance. *See generally* BZA Application No. 20665, DCOZ (Apr. 13, 2022), https://app.dcoz.dc.gov/Home/ViewCase?case_id=20665; https://perma.cc/6V54-7FHW (first examining an applicant's request for a special exception, and then for a variance); *see also Metropole Condo. Ass'n v. D.C. Bd. of Zoning Adjustment,*141 A.3d 1079 (D.C. 2016) (same).

Under the Zoning Regulations, Subtitles X and C govern the grant of a theoretical subdivision as a special exception. Starting with Subtitle X, Section 900.2 provides in relevant part that, "[t]he [BZA] is authorized to grant special exceptions . . . where, in the judgment of the [BZA], the requested special exception meets the standards of Subtitle X § 901 and any specific conditions specified in this title." 11 D.C.M.R. Subtitle X § 900.2.

Per Section 901, which outlines the review standards for a special exception, the BZA may grant a special exception when:

> [I]n the judgment of the [BZA], the special exceptions:

(a) Will be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Maps;

(b) Will not tend to affect adversely, the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps; and

(c) Will meet such special conditions as may be specified in this title.

*Id.* § 901.2.

Next, Subtitle C § 305 regulates theoretical subdivisions specifically. Under this provision, "the [BZA] may grant, through a special exception, a *waiver* of Subtitle C § 302.1 [Subdivision Regulations] to allow multiple primary buildings on a single record lot provided that, in addition to the general special exception criteria of Subtitle X, Chapter 9, the requirements of this section are met." 11 D.C.M.R. Subtitle C § 305.1 (emphasis added). The waivable subdivision regulations enumerated under Section 302.1 include those for "yards, courts, other open space, *minimum lot width*, minimum lot area, floor area ratio, percentage of lot occupancy, parking spaces, or loading berths applicable to that lot or any lot created." 11 D.C.M.R. Subtitle C § 302.1 (emphasis added). Notably, certain development standards cannot be waived in granting a theoretical subdivision. Those are specifically listed in Section 305 to include:

(a) Side and rear yards of a theoretical lot shall be consistent with the requirements of the zone;

(b) Each means of vehicular ingress and egress to any principal building shall be at least twenty-four feet [] in width, exclusive of driveways;

(c) The height of a building governed by the provisions of this section shall be measured from the finished grade at the middle of the building façade facing the nearest street lot line; and

(d) The rule of height measurement in Subtitle C § 305.3(c) shall supersede any other rule of height measurement that apply to a zone, but shall not be followed if it conflicts with the Height Act.

*Id.* § 305.3.

Thus, a plain reading of Section 305 and 302 makes it expressly clear that theoretical subdivisions can be applied to waive certain development standards but not others. Expressly included in those waivable development standards enumerated under Section 302 are minimum lot width requirements. Therefore, the Zoning Regulations regulatory scheme allows the BZA to grant, in its discretion, a theoretical subdivision as a special exception to waive the Forest Hills minimum lot width requirement. 11 D.C.M.R. Subtitle C §§ 302.1, 305.1.[7]

---

[7] We reject Petitioners' invocation of Subtitle D, Chapter 52. Chapter 52 states that "[r]equested relief that does not comply with specific conditions or limitations of a special exception authorized by this chapter shall be processed as a variance pursuant to Subtitle X, Chapter 10." 11 D.C.M.R. Subtitle D § 5200.2.

**B.** **Lot Requirement Waivers Under a Special Exception Do Not Also Require a Variance**

Petitioners assert a special exception alone is not enough to waive development requirements; the BZA must grant a variance to waive the minimum lot width requirement. We are unpersuaded by this argument because the Zoning Regulations treat variances and special exceptions as independent and separate forms of zoning relief.

A variance differs from a special exception in both its form and the burden of proof required for its granting. *See Daniel v. D.C. Bd. of Zoning Adjustment*, 329 A.2d 773, 775 (D.C. 1974). Variance relief "is an authorization to a property owner to depart from the literal requirements of the Zoning Regulations in utilization of his property." *Id.* For an area variance to be granted, the burden of proof lies on the applicant to demonstrate "that (1) there is an extraordinary or exceptional condition affecting the property; (2) practical difficulties will occur if the zoning regulations are strictly enforced; and (3) the requested relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose,

---

However, that Chapter, as is relevant to adding new principal residential buildings to a lot, only applies to "substandard non-alley record lot[s] as described by Subtitle C § 301.1." *Id.* § 5201.1. There has been no indication that the subject property here is a substandard lot as described by Section 301.1, nor do Petitioners assert that the subject property is a substandard lot. For that reason alone, Chapter 52 is inapplicable here.

and integrity of the zone plan." *Roth v. D.C. Bd. of Zoning Adjustment*, 279 A.3d 840, 846 (D.C. 2022) (citation modified); 11 D.C.M.R. Subtitle X § 1002.1(a).[8] Under our precedent, in order to meet the "practical difficulties" standard for an area variance, an applicant "must demonstrate two things: first, 'that compliance with the area restriction would be unnecessarily burdensome' and second, 'that the difficulties are unique to the particular property.'" *McDonald*, 291 A.3d at 1125 (D.C. 2023) (citing *Neighbors for Responsive Gov't, LLC v. D.C. Bd. of Zoning Adjustment*, 195 A.3d 35, 56 (D.C. 2018)). In determining whether this standard is met, it is "proper for the BZA to consider a wide range of factors, including (but not limited to) economic use of property and increased expense and inconvenience to the applicant." *Neighbors for Responsive Gov't, LLC*, 195 A.3d at 56 (citing *Gilmartin*, 579 A.2d at 1170-71).

Special exceptions, on the other hand, are granted if, in the judgment of the BZA, the exception will "(1) be in harmony with the general purpose and intent of the zoning regulations and maps, (2) not tend to have an adverse effect on the use of neighboring property in accordance with the zoning regulations and maps, and

---

[8] Area variances have a different, lower, standard than use variances. *See Gilmartin v. D.C. Bd. of Zoning Adjustment*, 579 A.2d 1164, 1170 (D.C. 1990) ("[B]ecause of the nature of the respective types of variances and their effects on the zone plan, the higher 'undue hardship' standard applies to requests for use variances while the lower 'practical difficulty' standard applies to area variances.").

(3) meet all of the conditions specified in the zoning regulations." *Friends of the Field*, 321 A.3d at 685 (citing 11 D.C.M.R. Subtitle X § 901.2) (citation modified). "The applicant has the burden of proving entitlement to a special exception," *id.*, by showing that the exception sought will have "no undue adverse impact." 11 D.C.M.R. Subtitle X § 901.3. Once the conditions under Section 901.2 (as well as other applicable Zoning Regulations) and the applicant's burden of proof are met, the BZA's discretion to deny is limited. *See Neighbors for Responsive Gov't, LLC*, 195 A.3d at 53 (discussing a proposed shelter for emergency housing as a special exception, stating the BZA *must* approve the exception if it finds the express conditions of Section 901.2 and regulations specific to special exception uses have been met) (citing *Stewart v. D.C. Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C. 1973)). Furthermore, a theoretical subdivision as a special exception differs from a variance in pertinent part because it is *theoretical*—it does not change the record lot itself; a theoretical subdivision is a limited exception to allow the construction of multiple primary buildings on one lot without subdividing the record lot. *See* 11 D.C.M.R. Subtitle C § 305.1.

The applicant for a special exception is not tasked with showing unnecessary burdens or unique difficulties to their property in order to meet their standard for relief. Rather the applicant for a special exception must only show their request will have no undue adverse impact on the zone within which the property is located.

Theoretical subdivisions as special exceptions and variances are distinct forms of zoning relief. As previously stated, theoretical subdivisions serve as a very specific exception to lot subdivision standards. *See* 11 D.C.M.R. Subtitle C §§ 302, 305. Variances, however, create exceptions from a larger portion of the Zoning Regulations, including area and use regulations, which encompass a variety of development requirements and permitted uses. *See generally* 11 D.C.M.R. Subtitle X § 1001. It follows logically then that the standard required for a theoretical subdivision, which serves a limited function, is entirely different than that for an area variance, where the recorded physical boundaries of a lot or its uses would be subject to change.

As previously discussed, the Zoning Regulations permit the BZA to waive certain development standards, including minimum lot width requirements, in granting a theoretical subdivision as a special exception. Furthermore, because of the different types of zoning relief that theoretical subdivisions and variances allow, it would not be contradictory, as Petitioners assert, for the BZA to deny a variance for a lot width requirement while also granting a special exception to waive the very same lot width requirement. Because the burden of proof is different for a variance than it is for a special exception, it is entirely plausible that applicants, like the Harrisons here, can meet their burden for the special exception standard but fail to meet their burden under the entirely different standard required for variances.

Therefore, we disagree with the notion that a special exception cannot be granted without an accompanying variance. The two are not obligate forms of relief to each other: both are treated as independent forms of zoning relief under the Zoning Regulations.

Finally, Petitioners contend that, in granting a waiver here, the BZA acted inconsistently with its prior practice of granting variances alongside special exceptions. We take this argument as asserting arbitrariness or capriciousness in the BZA's decision-making. However, in the summary orders Petitioners reference, where the BZA did not include findings of fact or conclusions of law, the BZA granted both forms of zoning relief because the applicant had met their burdens of proof for both the requested theoretical subdivision as a special exception and the requested variance.[9] Of the BZA's decisions and orders Petitioners reference, only

---

[9] *See* BZA Application No. 20665, DCOZ (Apr. 13, 2022), https://app.dcoz.dc.gov/Home/ViewCase?case_id=20665; https://perma.cc/6V54-7FHW (granting the requested variance and the special exception in order for the applicant to construct twenty new, three-story, row dwellings because applicant satisfied both burdens of proof); BZA Application No. 20078, DCOZ (Jan. 29, 2020), https://app.dcoz.dc.gov/Home/ViewCase?case_id=20078; https://perma.cc/QMX8-4VYB (granting the area variance and the special exception to raze an existing building and create six new theoretical lots because applicant satisfied both burdens of proof); BZA Application No. 20034, DCOZ (June 12, 2019), https://app.dcoz.dc.gov/Home/ViewCase?case_id=20034;

one construes the Zoning Regulations of 2016, BZA Application No. 19377. *See* DCOZ (July 11, 2018), https://app.dcoz.dc.gov/Home/ViewCase?case_id=19377; https://perma.cc/K6UA-QPX7. In that case, the BZA granted the requested theoretical lot subdivision and then separately granted an area variance for lot requirements unwaivable through special exceptions under Subtitle C § 305.3 for side and rear yards and means of vehicular egress and ingress. *Id.* Because Section 305.3 explicitly states that side and rear yard and vehicular egress and ingress requirements are unwaivable by special exception, the BZA needed to grant an area variance in addition to the theoretical lot subdivision to allow the applicant to develop their property. For the reasons discussed previously, the BZA did not need to also grant a variance in conjunction with the special exception here because Section 305.3 does not include minimum lot width requirements among the list of

---

https://perma.cc/8MYC-L8T5 (granting the area variance and the theoretical subdivision special exception to relocate an existing principal dwelling and construct a new six-story, eight-unit, apartment house because applicant satisfied both standards of proof); BZA Application No. 19849, DCOZ (Oct. 31, 2018), https://app.dcoz.dc.gov/Home/ViewCase?case_id=19849; https://perma.cc/XQ9W-JL9G (granting the area variance and the theoretical subdivision special exception to construct seven new flats and four attached-principal dwelling units of affordable housing because applicant satisfied both burdens of proof); BZA Application No. 19819, DCOZ (Sept. 19, 2018), https://app.dcoz.dc.gov/Home/ViewCase?case_id=19819; https://perma.cc/U46U-ZH79 (granting the area variance and the special exception to demolish the existing apartment houses and construct new apartment houses and principal dwelling units, as well as a community center, because applicant satisfied both burdens of proof).

unwaivable development standards. In granting both the special exception and the variance in BZA Application No. 19377, the BZA determined the applicant successfully met the respective burden of proof for each form of relief sought. *Id.*

Petitioners' reliance on this BZA decision and order, like the summary orders, is thus misplaced. Not only was the BZA in different regulatory territory here, because it did not need to be concerned with Section 305.3, the BZA also acted consistently with its prior practice from those cases cited by Petitioners of granting special exceptions and variances independently under entirely different burdens of proof as required by D.C.'s regulatory scheme.

We therefore discern neither arbitrariness nor capriciousness. The BZA's plain language reading of the regulatory scheme is not at all unreasonable or against its prior practice; in fact, we are equally persuaded on de novo review that it is the correct reading of the regulations.

* * *

Here, the BZA noted the previously discussed regulatory scheme including Subtitles X and C and determined that Subtitle C "authorizes the Board to grant a waiver allowing more than one primary building on a single record lot." Further, the BZA cited and gave "great weight" to OP's report where OP considered and recommended that the BZA approve the Harrisons's application for relief pursuant

to Subtitles X and C "for multiple buildings on a single lot." The BZA found that the Harrisons's application was consistent with the "intent and purpose of the Zoning Regulations," and it was unlikely "to have an adverse effect on the present character or future development of the neighborhood." Thus, the BZA determined that the Harrisons met the requirements for a special exception and further met their burden of proof that the requested theoretical subdivision would not adversely affect the use of neighboring property in accordance with the Zoning Regulations.

In reaching its conclusion to grant the theoretical subdivision special exception but deny the width variance, the BZA specifically rejected Petitioners' argument that a variance was required to grant the special exception. The BZA aptly stated the following:

> [T]he Zoning Regulations authorize the [BZA] to grant a waiver of the subdivision requirements, including minimum lot width, in a theoretical subdivision that meets specific development standards. Minimum lot width is not listed as one of the development standards that must be satisfied in a theoretical subdivision; therefore, the [BZA] is authorized to waive that requirement and a theoretical lot created in a theoretical subdivision is not subject to the same minimum lot width requirement applicable to a new record lot created in a subdivision in accordance with Subtitle C § 302.1.

We conclude that the BZA granted the special exception without contradicting its decision to deny the variance.[10] That the Harrisons failed to meet the standard for their requested variance but succeeded in their application for a theoretical subdivision special exception was a determination entirely within the BZA's discretion pursuant to the Zoning Regulations. We discern no error in the BZA's analysis or reasoning.

## IV. Conclusion

For the foregoing reasons, we affirm the BZA's Decision and Order to grant the theoretical lot subdivision as a special exception.

*So ordered.*

---

[10] In denying the Harrisons's requested area variance, the BZA found that the property does not "face[] . . . any exceptional situation or condition that would warrant approval of the requested variance," but noted that the requested variance would not "result in substantial detriment to the public good." Had the BZA found that the requested variance would have detrimentally impacted the public good, that determination could conceivably compromise the standard required for the special exception because it could constitute an adverse impact, and would have substantiated Petitioners' arguments.